**UNITED STATES of America,**
**Appellee Cross–Appellant,**

v.

**Walter J. BUTLER, Defendant–**
**Appellant Cross–Appellee.**

**Nos. 395, 516, Dockets 91–1191, 91–1239.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1991.

Decided Jan. 17, 1992.

John A. Cirando, Syracuse, N.Y. (Patrick J. Haber, Ivette C. Iza, on the brief) for defendant-appellant-cross-appellee.

Grant C. Jaquith, Asst. U.S. Atty., N.D.N.Y. (Frederick J. Scullin, Jr. U.S. Atty., of counsel) for appellee-cross-appellant.

Before PRATT, MAHONEY and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

A grand jury in the Northern District of New York indicted Walter J. Butler, a union official and trustee of several employee benefit funds, for various financial improprieties. Butler was convicted, after a jury trial, on four counts in the indictment: racketeering (18 U.S.C. § 1962(c) (RICO)); causing false representations to be made in ERISA documents (18 U.S.C. § 1027); embezzlement of union funds (29 U.S.C. § 501(c)); and mail fraud (18 U.S.C. § 1341). The jury, however, acquitted Butler on the remaining six counts in the indictment. The district court for the Northern District of New York (Munson, *Judge*) then sentenced Butler to 21 months of imprisonment, a $30,000 fine, and ordered defendant to forfeit $29,295.79. The period of incarceration is conceded to be a downward departure from the applicable guideline range.

Butler now challenges his convictions, principally on the ground of insufficient evidence. The government cross-appeals Judge Munson's downward departure. For the following reasons, we affirm the convictions, reverse on the cross-appeal, and remand for resentencing.

## BACKGROUND

As a union official, Walter J. Butler wore a number of related hats. For almost thirty-five years, Butler served as president of Local 200, General Service Employees International Union ("Local 200"), represent-

ing over 16,000 employees in the Upstate New York region. He was also a trustee of four employee benefit funds affiliated with Local 200. In 1979, defendant became a vice president of Service Employees International Union ("International"). Additionally, from 1981–1988, Butler acted as secretary-treasurer of Local 362, a Florida-based union which, like Local 200, was under the umbrella of the International.

The employee benefit funds were managed by trustees. Half the trustees were either full-time employees of Local 200 (as was defendant) or rank-and-file members of Local 200; the other half were appointed by whatever employer participated in the fund. Before the enactment of ERISA,[1] the benefit funds paid the trustees a fixed expense allowance for attending trustee meetings. ERISA changed this practice by making it unlawful for trustees of employee benefit funds, who are also full-time employees of either the participating employer or union, to receive fixed expense allowances from the funds; instead, benefit funds can reimburse such trustees only for actual expenses. *See* 29 U.S.C. § 1108(c)(2). The benefit funds for which defendant was a trustee thereafter agreed to reimburse their trustees for actual expenses.

At a meeting of Local 200's Executive Board, defendant announced that because of the changes mandated by ERISA, "there will probably be no expenses paid to the union and employer trustees of our pension and welfare funds." Because ERISA does not prevent a union from paying out of its own treasury—as distinct from the benefit funds—a fixed expense allowance to a trustee of a benefit fund, defendant urged that the Executive Board of the union resolve to pay fixed expense allowances to union trustees out of Local 200's treasury. The Executive Board passed such a resolution for the benefit of all the union trustees.

The Executive Board initially fixed the payments to union trustees at $50 per meeting attended for each individual fund.

1. The Employee Retirement Income Security Act of 1974, codified at 29 U.S.C. §§ 1001–1461.

Some time later, defendant unilaterally increased this amount to $75, and later again to $100. In requesting these expense allowances from Local 200, defendant never told the Executive Board that the benefit funds were also paying the trustees for their actual expenses. By concealing this, defendant was able to double dip on expense payments.

Defendant's course of conduct also involved his son, W. James Butler ("Jimmy"). Jimmy worked for Local 200 as a part-time, summer employee from 1974 until he graduated from law school in 1981. In 1981, Jimmy became a full-time employee of Local 200, and, later, he also became an employee of the Central New York Welfare Fund, one of the Local 200 benefit funds.

Prior to 1978, Christmas bonuses and vacation pay were awarded to part-time employees in the discretion of Local 200's president (defendant) and its secretary-treasurer. In 1978, however, the Executive Board of Local 200 removed this discretion by passing a bonus and vacation pay schedule that limited such payments to full-time employees. Ignoring the resolution, defendant ordered that his son be paid Christmas bonuses and vacation pay for the summers Jimmy worked for Local 200. And after his son graduated to a full-time employee of both Local 200 and the Central New York Welfare Fund, defendant ordered that Jimmy be paid bonuses and vacation pay that exceeded the amount fixed in the schedule approved by the Executive Board.

Defendant's union activities also carried him to Florida, where, from 1981–1988, he served as secretary-treasurer to both Local 362, another affiliate of the International, and the Florida State Council, a loosely-knit association of Florida-based union locals. From August 1986 through July 1987, both Local 362 and Florida State Council made monthly payments to Butler to maintain a condominium in Dania, Florida, ostensibly as an office for Local 362.

In July 1987, Florida State Council decided to stop making the condominium payments. Then, Local 362's Executive Board also decided not to make any more rent payments for the condominium. To make up the shortfall, Butler asked Local 362 to pay him an expense allowance for his activities on its behalf without reminding anyone that he was already receiving reimbursement for actual expenses incurred while performing services for Local 362. In making his "request" for an expense allowance, defendant threatened any Board member who questioned his expenses with sanctions by the International. Not surprisingly, a resolution was thereafter passed providing an expense allowance to defendant, which he received on a monthly basis from August 1987 through April 1988. After this resolution was passed, defendant performed no further services for Local 362.

There is one final thread in this tapestry. As president of Local 200, defendant hired and set the compensation for Local 200's officers and employees. For their retirement, Local 200 employees were covered by the Service Employees International Union Affiliates Officers and Employees Pension Plan ("the Plan"). Local 200 was obligated to contribute 14% of each employee's gross compensation to the Plan. The Plan excluded from the definition of gross compensation "expenses paid or reimbursed to the Covered Persons."

Defendant split each employee's compensation into two checks, one denominated "salary" and the other, "expenses". However, defendant assured the employees that both components would constitute their gross compensation, and that whatever actual expenses they incurred would be reimbursed separately. When defendant completed the Plan's monthly remittance forms, he reported thereon only that portion of each employee's compensation that he had previously denominated as "salary." This underreporting of employees' actual compensation obviously reduced the contributions that Local 200 had to make to the Plan. The government suggested, at oral argument, that this savings allowed defendant to continue to loot the treasury of Local 200 to fund his other schemes.

*Sentencing*

Because the racketeering act involving the receipt of expense allowance payments

from Local 362 was completed after November 1, 1987, the Sentencing Guidelines applied to the RICO conviction. The presentence report set the base offense level on the RICO count at 19. U.S.S.G. § 2E1.1(a)(1). Pursuant to Section 3B1.3, two levels were added for defendant's abuse of his position of trust. *Id.* § 3B1.3. Then, with an adjusted offense level of 21 and a criminal history category of I, the resulting guideline range was 37–46 months.

The district court accepted this calculation of the guideline range, but proceeded to grant defendant's motion for a downward departure, stating:

> [T]his Court does not believe that this is a typical case that the Sentencing Commission had in mind when it sampled pattern RICO cases and then set the minimum base offense level at 19. I am mindful of the introductory commentary to the racketeering guideline section which states that the offense level usually will be determined by the offense level of the underlying conduct. In making this departure, the Court agrees with the motion of the defense that in this particular case, there exists mitigating circumstances of a kind or a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. In fashioning this departure, this Court strongly believes the offense level 15, as calculated for the underlying Racketeering Act, ... more accurately reflects the offense conduct of which the defendant was convicted.

The district court then sentenced defendant to 21 months of imprisonment instead of a term between 37 and 46 months.

## DISCUSSION

### I. *Butler's Appeal*

Butler argues that the evidence was insufficient to support his convictions. To succeed in a challenge to the jury's verdict, defendant must bound some high hurdles. *See United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir.) ("[a] defendant challenging the sufficiency of the evidence bears a heavy burden"), *cert. denied*, 484

U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). The evidence must be viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and all permissible inferences must flow towards the jury's verdict. *See United States v. Giraldo*, 822 F.2d 205, 213 (2d Cir.), *cert. denied*, 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987). When we review the sufficiency of the evidence we need not be "convinced of guilt beyond a reasonable doubt." *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Rather, where "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we will not disturb the jury's verdict. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

### *Embezzlement*

As to the charges that Butler embezzled funds from Locals 200 and 362 and from the employee benefit funds, defendant claims there was insufficient evidence to prove his fraudulent intent. We reject defendant's challenge.

Authorization from and benefit to the union are the controlling lodestars to determine whether a defendant acted with the fraudulent intent to deprive the union of its money. *See United States v. Floyd*, 882 F.2d 235, 239–41 (7th Cir.1989). Accordingly, we have held that a union official charged with embezzling union funds, pursuant to 29 U.S.C. § 501(c), lacks the requisite criminal intent when the evidence establishes that he had a good-faith belief both that the funds were expended for the union's benefit and that the expenditures were authorized (or would be ratified) by the union. *See United States v. Ottley*, 509 F.2d 667, 671 (2d Cir.1975); *see also United States v. Silverman*, 430 F.2d 106, 127 (2d Cir.), *modified on other grounds*, 439 F.2d 1198 (2d Cir.1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123

(1971).[2] To phrase it in the negative, authorization by the union or the trustees of a fund will not absolve a union official or fund trustee from criminal liability where that individual, acting with the intent to deprive the union of its property, lacks a good-faith belief that the expenditure is for the benefit of the union. *See United States v. Capanegro*, 576 F.2d 973, 979–80 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978). Whether the defendant harbored a good-faith belief that an expenditure was for the benefit of the union is, of course, a jury question. *See Ottley*, 509 F.2d at 671.

Defendant argues that, because all his expenditures were either authorized or would have been ratified, the only jury question was whether he had a good-faith belief that the expenditures were for the benefit of the unions or the funds. As to this issue, he claims the evidence was insufficient.

We cannot join defendant in his facile assumption that the expenditures were or would have been properly approved. In selling to Local 200's Executive Board his plan that union trustees should receive fixed expense payments for attending trustee meetings, defendant concealed from the Board that the union trustees were already being fully compensated for actual expenses. An authorization obtained without disclosure of such material information is obviously a nullity. *See United States v. Lavergne*, 805 F.2d 517, 523 (5th Cir.1986). To compound matters, the evidence indicated that defendant later increased the per-meeting payments from the Board "authorized" amount of $50, first to $75, and later to $100—all without Board approval.

As to the payments to defendant's son, the record makes clear that these payments were not authorized. After 1978, defendant had no authorization to pay vacation pay or Christmas bonuses to anyone but full-time employees. Yet, defendant continued to extend this largesse to his son, even though Jimmy did not become a full-time employee until 1981. And, once Jimmy became a full-time employee, the payments made to him exceeded the amounts approved by Local 200's Executive Board in the bonus and vacation pay schedule.

Finally, as to the expense payments from Local 362, there was sufficient evidence for the jury to find that defendant used strong-arm tactics to obtain such authorization. We find it difficult to fathom that such authorization can be deemed to have been properly obtained; and the jury certainly could have found that defendant lacked a good-faith belief that these expenditures were *properly* authorized or would have been ratified, as the union "presumably would have objected if it had been able to speak freely." *Silverman*, 430 F.2d at 127.

Even accepting at face value defendant's argument that all these payments were authorized or would have been ratified, the evidence was still sufficient to establish his fraudulent intent. The record bristles with evidence that defendant lacked a good-faith belief that these expenditures would benefit the unions or the funds. We need cite only a few portions of the record.

When George Kennedy, assistant to the president of Local 200, eventually confronted defendant about the amounts he was receiving as fixed trustee meeting expense allowances—in addition to reimbursement for actual expenses—defendant stated, "George, I can't change my lifestyle." It was also proper for the jury to conclude that defendant lacked a good-faith belief that payments to his son—who, for a significant period of time, provided no services and yet received bonuses and vacation pay—were for the benefit of the union or the fund. Finally, as to Local 362, there was evidence that after defendant obtained "authorization" for a monthly expense allowance, he performed no services for Local 362, but simply collected his checks.

---

**2.** We have applied a similar standard when determining the criminal intent of a trustee of an employee benefit fund who is charged with embezzlement from such a fund under 18 U.S.C.

§ 664. *See United States v. Snyder*, 668 F.2d 686, 690–91 (2d Cir.), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982).

For the foregoing reasons, we hold that the evidence was sufficient to establish defendant's fraudulent intent.

*False Statements in ERISA Documents*

■ Butler challenges the sufficiency of the evidence to establish that he knowingly made false statements in ERISA documents. We find the evidence sufficient.

The Plan required the union treasury to contribute 14% of each union employee's "Gross Compensation," which was defined to exclude "expenses paid or reimbursed" to the covered employee. Butler, as President of Local 200, had to file monthly remittance reports indicating each employee's gross compensation, and, based thereon, the amount Local 200 was required to contribute per employee.

The evidence established that defendant paid each employee with two checks, one denominated as "salary" and the other as "expenses." The "expenses" check, however, bore no relation to any expense, as all employees were separately reimbursed for their actual expenses. Rather, the "expenses" check amounted to straight compensation under another name. When George Kennedy asked defendant how this arrangement would affect his pension, defendant stated that, at some future date, the two checks ("salary" and "expenses") would be combined, and contributions to the Plan would then be based on the combined amount. And, defendant stated, so long as the contributions for the last three years of an employee's career were based on the combined amount, there would be no adverse effect on the employee's pension.

The jury could reasonably find that this artificial split in compensation was merely an artifice designed by defendant to reduce the amount that the Local 200 treasury was required to contribute to the Plan. Defendant's very own witness—who was called to testify that it is standard union practice not to make contributions based on expense allowances—admitted on cross-examination that contributions are not made on expense allowances only if those allowances are furnished with the intent that they will be spent on business expenses. Such clearly was not the case here. The jury was properly instructed as to the requirement that defendant knowingly made these misrepresentations, *see United States v. Tolkow*, 532 F.2d 853, 858–59 (2d Cir.1976), and found that the statements were made knowingly. We see no reason to disturb this conclusion.

*RICO Enterprise*

■ Finally, defendant argues that, assuming the evidence was sufficient, the Sentencing Guidelines are not applicable to the RICO count because only one racketeering act occurred after November 1, 1987, viz., the receipt of expense allowances from Local 362. He argues that Local 362 is a separate RICO "enterprise"—that is, it is distinct from Local 200 and from the employee benefit funds, and must be deemed its own enterprise. And, because a RICO conviction requires proof of two predicate racketeering acts in one enterprise, the single act relating to Local 362 cannot support a RICO conviction. Because the predicate acts supporting the RICO count all occurred pre-Guidelines, he argues that the RICO conviction is not subject to the Guidelines. We disagree.

Defendant's theory misreads the indictment, which charged one RICO count involving a multi-faceted enterprise. An "enterprise" under the RICO statute may consist of more than one entity, so long as those entities "have been connected by a defendant's participation in them through a pattern of racketeering activity." *United States v. Stolfi*, 889 F.2d 378, 380 (2d Cir. 1989); *see also United States v. Huber*, 603 F.2d 387, 394 (2d Cir.1979) (several distinct corporate entities may constitute a RICO enterprise), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). Here, the indictment charged a broad enterprise that included Local 200, the pension funds, and Local 362. There was proof that these entities were all under the umbrella of the International, and that defendant participated in these otherwise lawful organizations through a pattern of racketeering. The district court properly charged the jury that it had to find that these entities amounted to a single enterprise, and the jury so found.

Accordingly, the RICO conviction was a so-called "straddle offense," to which the Sentencing Guidelines were properly applied. *See United States v. McCall*, 915 F.2d 811, 816 (2d Cir.1990).

## II. *Government's Cross–Appeal*

The government appeals the district court's downward departure from the applicable guideline range. For the following reasons, we reverse the sentence.

A district court may depart from the applicable guideline range where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b); *see also* U.S.S.G. § 5K2.0 (policy statement). Because the central thrust of the Guidelines is to minimize disparity in the sentences of similarly situated defendants, a district court's authority to depart from the applicable range is circumscribed. *See United States v. Joyner*, 924 F.2d 454, 460–61 (2d Cir.1991). "Departure authority, though not designed to prevent a sentencing judge from exercising 'discretion, flexibility or independent judgment,' ... is nonetheless a device for implementing the guideline system, not a means of casting it aside." *Id.* at 460 (quoting *United States v. Lara*, 905 F.2d 599, 604 (2d Cir.1990)). Congress has expressed its intent, in no uncertain terms, that when a sentencing court departs from the applicable guideline range, that departure must be justified by *specific* reasons. 18 U.S.C. § 3553(c)(2) (sentencing court must state "specific reason" for imposing a sentence outside the applicable guideline range); *see United States v. Cervantes*, 878 F.2d 50, 54 (2d Cir.1989) (departure based on inadequacy of criminal history category).

■ We review *de novo* whether the factors relied upon by the district court as justifying a departure are of a kind, or present to a degree, not adequately considered by the Sentencing Commission. *United States v. Richardson*, 923 F.2d 13, 16 (2d Cir.1991); *United States v. Barone*, 913 F.2d 46, 50 (2d Cir.1990). The district court's factual findings are reviewed under a clearly erroneous standard. *Barone*, 913 F.2d at 50. And, when examining the validity of a departure, we consider only those reasons articulated by the district court; a party's *post hoc* proffer of additional reasons will not cure an unjustified departure. *See id.*

■ Here, the district court stated only that this case was not like the typical RICO cases that the Sentencing Commission had examined when the Commission fixed the minimum base offense level for a RICO conviction at 19. The district court noted the introductory commentary to the racketeering section of the Guidelines, which states: "The offense level [for a racketeering conviction] usually will be determined by the offense level of the underlying conduct." U.S.S.G. § 2E1 (Introductory Commentary). The court then held that the base offense level for the underlying racketeering acts—which was 15—accurately reflected defendant's offense conduct, and therefore sentenced defendant within that range.

Section 2E1.1 of the Guidelines, which controls the base offense level calculation for RICO convictions, provides:

(a) Base Offense Level (Apply the greater):

(1) 19; or

(2) the offense level applicable to the underlying racketeering activity.

U.S.S.G. § 2E1.1(a). The Application Notes to this section state: "If the offense level for the underlying racketeering activity is less than the alternative minimum level specified (*i.e.*, 19), the alternative minimum base offense level is to be used." *Id.* (Application Note 3).

Section 2E1.1 and Application Note 3 make abundantly clear that the Sentencing Commission acknowledged that, in certain RICO convictions, the base offense level for the predicate racketeering acts would be less than 19, but determined nevertheless that, in such situations, the appropriate base offense level would be 19. The district court's reference to the Introductory Commentary to Chapter 2 Part E is

unavailing. While that commentary refers to the *usual* racketeering conviction, the Sentencing Commission made clear, in Section 2E1.1, that in the *unusual* situation where the base offense level for the underlying activity is less than 19, the base offense level had to be 19. Thus, the sole justification for the departure in this case was considered and rejected by the Commission.

■ The district court offered no further reasons why the circumstances of this case differ from the typical RICO case, either in kind or degree; and we, of course, should not speculate. We consider only those reasons specifically articulated by the district court for justifying a departure. *See Barone*, 913 F.2d at 50.

## CONCLUSION

We have considered defendant's other claims and find them to be without merit. We hold that the evidence was sufficient to support defendant's convictions, and we, therefore, affirm the appeal. However, because we find that the downward departure was unjustified, we reverse on the cross-appeal and remand for resentencing.

AFFIRMED in part; VACATED and REMANDED for resentencing.