KAVANAUGH, Circuit Judge,
concurring in part and dissenting in part:
I would reject all of Noble’s § 501 claims, affirm the District Court’s § 501 judgment, and end this 14-year litigation odyssey.
Section 501(a) of the Labor-Management Reporting and Disclosure Act provides that union officers “occupy positions of trust” and that it is the officers’ duty “to manage, invest, and expend” the union’s money and property “in accordance with its constitution and bylaws.” 29 U.S.C. § 501(a). A union member such as Noble may sue a union officer for alleged violations of § 501(a) in order “to recover damages or secure an accounting or other appropriate relief’' — but only “for the benefit of the labor organization.” § 501(b) (emphasis added). Under § 501(b) of the LMRDA, postal union member Noble filed suit against postal union officers; he claimed that the officers misinterpreted and violated the union constitution in granting themselves various payments and benefits.
In my judgment, this case turns on the nature of the judicial role in § 501 disputes. Our precedents and the statutory text and structure establish a basic principle of judicial restraint in these cases. When a union member sues union officers under § 501 and alleges that they violated the union constitution, we have held that the reviewing court owes “considerable deference” to the officers’ interpretation of the constitution; we uphold their interpretation unless it is “unreasonable or made in bad faith.” Monzillo v. Biller, 735 F.2d 1456, 1458 (D.C.Cir.1984). Of particular importance here, we afford even greater deference to union officials when the union convention has approved the officers’ interpretation of the union constitution; we have said that union approval “undermines a finding that the [officers’] interpretation was unreasonable and made in bad faith.” Id. at 1464. This is the same kind of rule that applies to analogous shareholder derivative actions where it is a “settled proposition that shareholder ratification by a majority of the disinterested shareholders acts as a safe harbor in situations where directors’ potentially conflicting self-interests are at issue. Thus, in a classic self-dealing transaction the effect of a fully-informed shareholder vote in favor of that particular transaction is to maintain the business judgment rule’s presumptions.” Solomon v. Armstrong, 747 A.2d 1098, 1115 (Del.Ch.1999) (internal citation omitted); see also Sample v. Morgan, 914 A.2d 647, 663 (Del.Ch.2007).
*1243 The critical point in this case, therefore, is the following: On two occasions, the union convention, which under the union constitution is the union’s “supreme body,” overwhelmingly voted against Noble’s claims and approved the officers’ challenged payment practices. Art. 1, § 4. At a Special Convention, 95 percent of approximately 2,000 voting union members specifically rejected the merits of Noble’s allegations. A few years later, by a vote of nearly 90 percent of approximately 4,500 voting union members, the National Convention adopted a resolution affirmatively approving the officers’ payment practices and confirming that they properly exercised their authority. Because the union approved its officers’ interpretation of the union constitution, the federal courts have limited authority under our precedents to upset that interpretation, at least absent an unusual or egregious set of facts.
In this case, the officers’ interpretation of the constitution was at least reasonable — which no doubt is why the union twice overwhelmingly approved their interpretation. As to each of the three issues Noble raises, his contrary reading of the constitution is debatable at best. Noble certainly cannot find the kind of unambiguous constitutional language that, under our precedents, would justify a decision by Article III judges to override the union conventions’ twice-considered judgment of what is in their best interests.
First, contrary to Noble’s idiosyncratic views, the union constitution did not unambiguously prohibit the Executive Council from authorizing reimbursement of un-itemized in-town expenses; in fact, it permitted the Executive Council to “authorize ... the payment of ... expenses, allowances, and other disbursements which it deems necessary and appropriate to the purpose and functioning of this Union, other than provided for.” Art. 9, § 11(e)(3). Noble seems to equate any un-itemized expense reimbursement or allowance with a prohibited salary increase, but the constitution simply does not say that. Moreover, un-itemized expense reimbursements or allowances are hardly so uncommon as to raise an inference of an under-the-table “salary increase,” at least if the reimbursements are reasonable in amount, as they were here. To be sure, un-itemized expense accounts sometimes result in windfalls and uncertain tax complications, but they also can save both the employer and employee from burdensome administrative paperwork, which is why they can make sense when the amounts in question are relatively minimal. That likely explains why an overwhelming percentage of the rank-and-file voting union members had no problem with the officers’ in-town expense reimbursements and voted to approve them.
Second, contrary to Noble’s argument, the union constitution did not unambiguously bar reimbursement of officers’ FICA taxes; in fact, it authorized the Executive Council to “establish such benefits as may be required to attract and retain competent personnel.” Art. 9, § 1 1(e)(4). Noble’s strained interpretation would treat many “benefits” as prohibited salary increases, largely erasing the constitution’s clear distinction between salary and benefits. Under Noble’s interpretation, for example, an increase in health insurance benefits for the officers would amount to a prohibited salary increase. But the union constitution says no such thing. So too with respect to reimbursement of FICA taxes. The decision to pay the FICA taxes was entirely reasonable, moreover, because it avoided the “double taxation” that some officers otherwise would face with respect to their retirement benefits as a result of their participation in the Civil Service Retirement System.
*1244 And third, contrary to Noble’s submission, the union constitution did not unambiguously prohibit officers’ acceptance of per diems during the National Conventions; in fact, it stated that “[p]er diem shall be paid to each officer as the National Association, while in session, may direct.” Art. 13, § 2. The per diems were reasonable in amount, moreover, particularly given that union officers went “off expenses” during convention week, meaning that they otherwise were not reimbursed for out-of-pocket expenses.
To be sure, Noble offers a plausible interpretation of the somewhat convoluted constitutional language on these three issues, and he may have a good policy argument why union officers should have been even more tightly monitored. But the officers’ interpretation of the constitutional language is not unreasonable and is nowhere near the kind of egregious interpretation that would warrant a judicial override of the union’s overwhelming approval of the officers’ interpretation. I do not agree, moreover, with Noble’s contention that the union votes somehow constituted unlawful “exculpatory resolutions.” See 29 U.S.C. § 501(a). As the District Court rightly concluded, the union votes did not excuse prior constitutional violations; rather, they reflected the union’s conclusion that no violations had ever occurred.
Finally, for the reasons already explained, the payments in question also were not otherwise “manifestly unreasonable,” even assuming that formulation qualifies as a separate test for § 501 claims. Cf. Morrissey v. Curran, 650 F.2d 1267, 1274 (2d Cir.1981).
I would affirm the judgment of the District Court on the § 501 issue. I join all but Parts III and IX of the per curiam opinion.*
WILLIAMS, Senior Circuit Judge,
concurring in part and dissenting in part:
I join Parts I, II, VI, VII, and VIII of the per curiam opinion, as well as those portions of Part III concerning the district court’s fact-finding and the separate arguments of defendants Dunn and Vincenzi. I respectfully dissent from the resolution of Noble’s other claims under 29 U.S.C. § 501(b).
The majority’s central error lies in its readiness to accept interpretations of the union’s constitution that gut that document’s minutely detailed salary caps. These interpretations allow the officers to help themselves to union money at will by:
—dispensing with the constitution’s requirement of itemized receipts for expense reimbursement (the $500 monthly in-town expense allowances), and
—interpreting “benefits” to encompass salary increases whenever they believe the extra money will help the union “retain competent personnel,” namely themselves (the FICA reimbursement issue).
Not content with that, the court short-circuits fact-finding on whether the convention delegates, in approving per diem payments, had any notice that the per diems covered officers’ costs that the union itself had already met.
In his separate opinion, Judge Kava-naugh would go even further. He would hold that, in all but the most exceptional cases, the courts have essentially no role whenever delegates to a subsequent union convention accept an interpretation of the union’s constitution presented by officers to justify their past conduct. As I develop below, this contradicts both the language *1245 and the purpose of the Labor Management Reporting and Disclosure Act (“LMRDA”).
I would find the officers’ interpretations with respect to the in-town expense allowances and FICA reimbursements to be unreasonable in light of the relevant text; the extrinsic evidence only strengthens this conclusion. The dispute over the per diem payments, meanwhile, doesn’t involve interpretation of the union constitution at all, but rather factual claims — never addressed by the district court — that the officers failed to adequately disclose the nature of their double compensation before the union convention approved the payments. I will address the three in that order.
I. The $500 Monthly In-Town Expense Allowances
The in-town expense allowance program, which handed NALC’s officers $500 a month on their say-so alone, cannot be justified on any reasonable reading of NALC’s constitution. Article 9 of that constitution determines the precise salary that each officer will receive, down to the last dollar. NALC Const, art. 9, §§ 1-10. (E.g., $62,699.00 for the executive vice president in 1992; no promiscuous rounding here!) Only the National Convention may alter this salary, and only by constitutional amendment. The Executive Council may act “on all matters ... not specifically prohibited by the membership,” id. art. 9, § 11(e), but this does not mean prohibited matters must be mentioned by name. In fixing the officers’ salaries, the constitution never explicitly forbids payment of under-the-table salaries, but that hardly means the officers could vote themselves one; there is no ambiguity or textual “gap” on the point. Rather, NALC’s constitution guards against officers’ subverting the limit via sinecures, providing that no officer “shall receive more than one salary from the NALC.” Id. art. 14, § 6.
Along with fixing the salaries of the Executive Council, the constitution provides that “[i]n addition to their salaries, [the officers] shall be entitled to reimbursement of all itemized expenses legitimately incurred in conduct of the affairs of the Union.” Id. ait. 6, § 1 (emphasis added). This clause is phrased as an exception to an otherwise-applicable limit on compensation, and it directly implies that unitemized expenses are not to be reimbursed. Placing union money in the officers’ hands, solely on those same officers’ bland assurances that it will be used for union business, completely subverts the clause’s obvious goal of preserving accountability. According to the union’s independent auditor, Sombrotto personally received $34,000 in reimbursements from November 1988 to July 1993, for which he provided only $5132 in receipts. See Joint Appendix (“J.A.”) 685. Defeat of the provision for reimbursement of itemized expenses could hardly be more complete.
The per curiam opinion reads the provision for reimbursement of itemized expenses as merely setting a floor, guaranteeing reimbursement for the officers’ itemized expenses without restricting what else they may receive. Maj. Op. at 1236. But on that reading, the Executive Council could always vote itself whatever reimbursements it thought appropriate, making a guarantee for reimbursement of itemized expenses entirely unnecessary. Rather than mere surplusage, the facially permissive language of Article 6 must be read as an implicit restriction, just as the power of Congress “[t]o establish ... uniform Laws on the subject of Bankruptcies” is read to limit, rather than supplement, any power to adopt non-uniform bankruptcy laws. See U.S. Const, art. I, § 8, cl. 4; Ry. Labor Executives’ Ass’n v. Gibbons, 455 U.S. 457, 468-69, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982).
*1246 Judge Kavanaugh’s separate opinion provides no better solution. He does not address the meaning of this provision, nor does he join Part III of the per curiam opinion. Rather, he considers the unitem-ized allowances within the officers’ power to set “salaries, wages, expenses, allowances, and other disbursements ... other than provided for.” NALC Const, art. 9, § 11(e)(3); cf. Kavanaugh Op. at 1243. This clause, however, confers discretion only over questions left unresolved by other constitutional provisions. The officers obviously could not rely on it to pay themselves the dual salaries prohibited by Article 14, nor to avoid Article 6’s limits on reimbursement of expenses.
The per curiam opinion’s reading is further weakened by the NALC constitution’s method of administering reimbursements. Article 11 charges the Fiscal Committee with “examining] all bills submitted for payment,” requiring that “[a]ll bills shall be itemized.” NALC Const, art. 11, § 2(b). The word “bills” includes requests for reimbursement, so Article 11 on its face appears to cover the demands for the $500 allowance. But let us assume ar-guendo that there is ambiguity in the term. In that case, the range of reasonable readings is limited by the factual context. As Sombrotto conceded in his testimony at trial, he considered Article ll’s requirements to apply to internal expenses incurred away from Washington, D.C. See Trial Tr. 4/13/04 at 129:4-9,:25, 130:1-2. Yet Article 11 makes no distinction as to where the expenses are incurred. The district court did not address the matter, despite Noble’s request, see PL’s Am. Proposed Findings of Fact & Conclusions of Law 6-7, Doc. No. 241, Ex. A (“PL’s Am. Proposed Findings of Fact”), but any contrary finding of fact would have been clearly erroneous in light of Sombrotto’s concession. Thus, the officers themselves considered Article 11 to apply to internal expenses. The officers might have interpreted “bills” to be unrelated to internal expenses, posing a different issue for review, but they never did so, and a fortiori they never did so reasonably. Assuming that some ambiguity remains, then, the extrinsic evidence merely confirms the text’s evident sense.
Judge Kavanaugh rests his concurrence (as to all three issues) on the union convention’s votes against Noble’s claims. Kavanaugh Op. at 1242-43. Of course, these were not votes of the full union membership, but rather votes of delegates to the annual convention. Such delegates have no exact counterpart in the corporate-shareholder analogy. They are elected agents of the members, and are more subject to personal influence by union officers, especially when they vote through public “teller” proceedings requiring them to stand and be counted individually rather than through secret ballot. They are, moreover, likely in some degree to share the officers’ viewpoints, interests, and perspectives. Thus “agency” problems — the tendency of agents to a degree to scant their principals’ interests in favor of their own — render the convention’s blessing a less effective absolution than a vote of the whole membership.
Nonetheless, convention resolutions, if adopted in a fair vote after informed disclosure, would indeed “undermine[ ] a finding that the [officers’] interpretation was unreasonable and made in bad faith.” Monzillo v. Biller, 735 F.2d 1456, 1464 (D.C.Cir.1984). But Monzillo treats a delegates’ resolution (a form of post-enactment legislative history) only as an interpretive thumb on the scale, not a conclusive extra weight. Section 501 precludes our allowing it any greater impact. Individual suits may be brought only after “the labor organization or its ... officers refuse or fail to sue,” § 501(b) (emphasis added), language that encompasses non- *1247 suit at the direction of a majority vote as well as any other process. Requiring an “unusual or egregious set of facts” to overcome a convention resolution, as Judge Kavanaugh would do, Kavanaugh Op. at 1243, will commonly turn this procedural precondition to suit into a virtually insurmountable barrier.
Judge Kavanaugh’s theory would also contradict the premise behind LMRDA’s mandatory reporting and fiduciary requirements: that even majorities of union members may lack the skill or incentives to protect themselves from predatory officials. To this end, § 501(a) declares any “general exculpatory resolution ... purporting to relieve any ... person of liability for breach of [fiduciary] duties” to be “void as against public policy”; giving near-conclusive effect to subsequent interpretive resolutions would enable union leaders to evade that ban. Cf. Morrissey v. Curran (“Morrissey /”), 423 F.2d 393, 399 (2d Cir.1970) (“[T]he provisions of § 501 would be completely emasculated if, every time a court ... found that the officers had breached their duties, the officers could find sanctuary by putting through a constitutional amendment or bylaw retroactively to legitimize] their former derelictions of duty.”). And since some bylaws are designed to protect a minority of union members from their fellows, ending the legal inquiry after a majority vote would be perverse, especially in light of closed-shop or union-shop rules that curtail employee exit. In this particular appeal, the resolutions cannot have so powerful an effect as to overcome the comparatively plain language of the union constitution.
Although I would reverse the district court’s judgment on the expense allowances in full, I join the per curiam opinion’s finding of clear error as to the historical fact of how the union’s money was used. Maj. Op. at 1236-37. Such misuse represents a violation of § 501’s independent duty to “account to [NALC] for any profit received ... [in] transactions ... on behalf of the organization,” § 501(a), as well as the more general fiduciary duties the statute imposes, see Maj. Op. pt. VII. Noble alleges not only that the expense allowance program was unauthorized, but that in collecting “reimbursements” the officers falsely represented that they had spent the requested amount on union business, a plain violation of these statutory duties. Given that Sombrotto encouraged the officers to apply for $500 monthly even when it exceeded their actual expenses, see Sombrotto Tr. 9/15/93, Pl.’s Ex. 47, at 4, the district court clearly erred by finding “no evidence” of this practice. Noble, slip op. at 17.[1]
Judge Kavanaugh does not address these additional allegations, see Kava-naugh Op. at 1243, but the subsequent interpretive votes are surely irrelevant here. The convention delegates voted only on whether the expense allowance program was constitutional, not whether the officers had actually used the money as the program required. The latter is a question of fact, not interpretation.
I also join the per curiam opinion with respect to the officers’ bad faith. Maj. Op. at 1237. The convention records on the matter are striking. At the 1976 Convention, in the course of a debate over an *1248 increase in dues, delegate John Bourlon rose to ask whether it was true that the officers were receiving $500 per month for “in-town expenses.” J.A. 165. James H. Rademacher, then president of the union— who had personally signed the 1975 Executive Council resolution approving the uni-temized reimbursements — answered by alluding to the constitutional provision for officers’ itemized expenses. The exchange proceeded as follows:
[Rademacher:] There is no stipulation in that Constitutional amendment, in-town, out-[of-]town or wherever it happens to be. If they itemized expenses they receive reimbursement according to the Constitution.... Does that answer you, Microphone 1?
[Bourlon:] No, sir, I’m sorry, it doesn’t answer it. I can agree with what the Chair has said[,] that the Constitution contains it and if they do itemize this thing, then I would agree, but the information I have says that they will be allowed $500 and it does not say if they list it on an expense account. It says they will be given $500.
[Rademacher:] Well, your information is incorrect. The Chair stands here in front of 5,000 delegates and says your information is incorrect.
J.A. 165-66.
Ten years later, at the 1986 Convention, Sombrotto presided over the statement of a similar misrepresentation in the context of a proposal to raise his own salary. Delegate Karen Lippe proposed limiting the increase for a variety of reasons, among them the FICA reimbursements (discussed below) and the fact that “all resident national officers receive a sum of $6,000 per annum unaccountable expense money.” J.A. 734. In response, Sombrot-to recognized a speaker “on privilege,” namely Gene McNulty, a National Business Agent and a member of the Executive Council. McNulty stated as follows:
I would like to correct the Sister.... Also, another piece of misinformation by the Sister, there is not for the resident national officers $6,000 unaccountable. They have to account for that. If you don’t believe me, check with the IRS.
Id. This was also false: while some officers did submit a limited number of receipts, they were never required to “account” for the actual use of the expense allowance, whether to the IRS or anyone else (although in the absence of receipts NALC evidently reported reimbursements as taxable income). Sombrotto did not correct this misrepresentation, though he had personal knowledge of the situation (and had commented from the chair on other measures). After McNulty’s “correction],” the debate did not return to the truth of Lippe’s charges; the convention voted her amendment down and approved the proposal to raise Sombrotto’s salary.
II. Reimbursement of FICA Payroll Taxes
The officers’ vote to have the union reimburse their personal share of FICA taxes similarly contravened the constitution’s clear text. Whether or not the reimbursements were sound policy, the constitution specified a precise salary for each officer. The majority argues that FICA reimbursements may be properly categorized as something other than salary, Maj. Op. at 1237-38; but although the Executive Council described the new payment as a “fringe benefit,” J.A. 598, under its power to establish “such benefits as may be required to attract and retain competent personnel,” NALC Const, art. 9, § 11(e)(4), even a purpose of attracting quality personnel can’t turn a salary increase into a non-salary benefit. Lacking authority to increase their own salaries other than by *1249 constitutional amendment, the officers necessarily lacked the power to evade this limitation by using a different label.
As I’ve mentioned above, NALC’s constitution sets forth a specific dollar amount for each officer as “the sum ... per an-num, payable weekly,” for “the faithful performance of [that officer’s] duties.” Id. art. 9, §§ 1-10. This definition clearly covers the FICA reimbursements, which directly expanded each week’s paycheck by a fixed amount, regularly increasing the annual payments made for the officers’ services. The constitutional text offers no basis for distinguishing a 7.65% “FICA reimbursement” from an illegitimate 7.65% raise. The reimbursements also fall within generally accepted definitions of salary, see 9 Oxford English Dictionary 48 (corrected ed.1933) (“[fjixed payment made periodically to a person as compensation for regular- work”); Webster’s Third New International Dictionary 2003 (1981) (“fixed compensation paid regularly ... for services”), and under the tax code are part of the officers’ wages for FICA purposes. See 26 U.S.C. § 3121(a), (a)(6)(A).
If the officers provided reasonable definitions of “benefits” and “salary” that included FICA reimbursements within the former and excluded them from the latter, we would defer under Monzillo. Cf. English v. Cunningham, 282 F.2d 848, 850 (D.C.Cir.1960) (“Courts will accept the correctness of an interpretation fairly placed on union rules by the union’s authorized officials.” (emphasis added)). But they have never done so. Before the district court, the officers stated only that they “have historically interpreted” their salaries to be “the amount paid annually to each officer for the services that he or she performs for the Union.” See Statement of Material Facts as to Which There Is No Dispute of Individual Defendants Sombrot-to et al., Doc. No. 128, pt. 2, ¶ 15, at 4 (Nov. 19, 2001); see also Sombrotto Decl. 11/19/01, Pl.’s Ex. 21, ¶9, at 3-4. The FICA reimbursements fit comfortably within that definition.
Moreover, if the term “benefits” includes payments indistinguishable from salary, there is no way to differentiate the payments that the officers cannot increase from the ones they can. Any regular payment to the officers (an “extra-special compensation supplement”?) could be justified on such grounds. An interpretation that “reads out of the constitution an important protective provision” is “patently unreasonable,” Loretangeli v. Critelli, 853 F.2d 186, 195 (3d Cir.1988); so a reading that decapitates the salary caps should fail. The constitution describes “benefits” as “including but not limited to annuity, welfare, vacations, holidays, severance pay, tuition or scholarship, and insurance benefits.” NALC Const, art. 9, § 11(e)(4). None takes the form of a fixed, regular, immediate, and unrestricted cash payment for each week worked. If such payments are “benefits,” then the constitution’s last restraint on the officers’ helping themselves to salary increases appears dead.
Nor does the officers’ theory of “double taxation” alter the analysis. Their salaries are constitutionally fixed in pretax terms— which they implicitly concede by paying their own personal income taxes — and, as they themselves allege, are adjusted at every biennial convention. See Mem. Supp. Mot. Summ. J. Filed by Individual Defs. Sombrotto et al., Doc. No. 128, pt. 3, at 7. The decision of each convention whether or not to grant a raise (and, if so, of how much) is made in the shadow of the governing tax law. Since FICA taxes were a longstanding obligation of all of the union’s full-time employees, rather than a new imposition in 1980, the officers would have had every opportunity to make their case to the convention beforehand. When NALC’s officers voted to lighten their- own *1250 tax burden at the union’s expense — a move they did not disclose to the membership until after Noble complained' — they usurped the convention’s authority to determine their salaries.
The majority places great weight on the payments’ “wisdom as a policy matter,” Maj. Op. at 1238, but this does nothing to resolve the interpretive issue. Perhaps the extra pay was useful “to attract and retain” officers; yet the officers’ authority must still be read consistently with the salary caps, for an unauthorized raise would have been equally attractive. The policy goal named in the clause is if anything a limitation on what benefits may be offered; it does not expand the category of “benefits” to include payments that are really salary increases. The only constitutional issue is whether the FICA reimbursements were a (permitted) benefit or a (forbidden) salary increase; business arguments for the reimbursements have no bearing on the issue.
Judge Kavanaugh’s opinion goes further, and argues that Noble’s argument “largely eras[es] the constitution’s clear distinction between salary and benefits.” Kavanaugh Op. at 1243. Quite the reverse. Although the constitution authorizes the Executive Council to offer “benefits” in order “to attract and retain competent personnel,” it gives no license to increase salaries for that purpose. The distinction may be formalistic, but it is in practice the only barrier to almost unlimited self-help. By looking to business reasons for upholding the 7.65% FICA increase, the majority erases the distinction and the constraint.
III. “Per Diem” Expenses During National Conventions
The majority rejects Noble’s claims concerning the “per diem” expenses; in so doing, it misconceives both the record and the nature of his challenge. Because the district court failed to rule on the relevant factual issues — and because this court cannot make the necessary findings on its own — the claim should be remanded for further development of the record.
At every biennial convention after 1964, a small group of unnamed delegates received a “per diem” payment calculated on the basis of certain estimated expenses: lost wages, hotel rooms, and meals and incidentals. Noble argued in the district court that the presidentially appointed Committee on Mileage and Per Diem asked each post-1964 convention to approve these payments without informing the delegates of two facts: (1) that the union’s officers were among those receiving per diem payments, even though they continued to earn their salaries and thus had no “lost time” (unlike rank-and-file mail carriers); and (2) that the union had already paid (in full or part) for most officers’ hotel rooms, transferring the union’s hotel discount to the officers’ benefit. Thus, the members were unaware of these costs’ peculiarities — peculiarities that might well have been material to then-decision.
Under our precedent in United States v. DeFries, 129 F.3d 1293 (D.C.Cir.1997), these allegations state a violation of § 501(a). Payments to the officers are invalid if made without informed consent, for “authorization secured ‘without disclosure of ... material information’ is a nullity.” Id. at 1307 (omission in original). De-Fries’ s “nullity” phrase comes from United States v. Butler, 954 F.2d 114 (2d Cir.1992), a case with facts strikingly similar to those here. The Butler court upheld the embezzlement conviction under § 501(c) of a union official who had secured approval for “fixed expense payments for attending trustee meetings” without revealing that he and other recipients “were already being fully compensated for actual expenses.” Id. at 119. The *1251 Second Circuit held that approval given under these circumstances was worthless. The Fourth and Fifth Circuits have agreed, holding that when union officers benefit directly from an expenditure, they must prove “that the funds ... were obtained with the valid authorization of the union after adequate disclosure.” Ray v. Young, 753 F.2d 386, 389 (5th Cir.1985);[2] accord Brink v. DaLesio, 667 F.2d 420, 424 (4th Cir.1981).
That union officers would receive a full per diem payment while having incurred no “lost time” and while enjoying union-provided hotel rooms could obviously have been material to the convention’s decision to approve the per diems. This is not merely a question of whether individual recipients could save money by eating cheaper meals or staying at a cousin’s apartment, but whether the factors on which the per diems were based were categorically inappropriate for a distinct group of recipients. Thus, while convention delegates probably understood that the per diems did not vary with run-of-the-mill variations in individual expenses, we have no basis to assume — as the district court made no findings on the matter — that there was adequate disclosure of the facts that reasonable delegates would have thought material.
Noble accordingly argued before the district court that the conventions had been misled. Pl.’s Am. Proposed Findings of Fact 19 (“Stating to the convention that ... the recommended per diem rate is based on consideration of lost time and hotel rates implies ... that the payment will be made to people who lose time and pay for their hotel rooms.”). But the district court failed to address Noble’s argument. Because he properly raises this issue on appeal, we could affirm only if Noble’s theory were inadequate as a matter of law (which it is not), or if it were unsupported by sufficient evidence in the record (i.e., if a finding in Noble’s favor would have been reversible for clear error). We cannot simply supply the factual finding ourselves, however, for “where the correctness of the lower court’s decision depends upon a determination of fact which only a [fact-finder] could make but which has not been made, the appellate court cannot take the place of the [fact-finder].” United States v. Hill, 131 F.3d 1056, 1061 (D.C.Cir.1997) (alterations in original) (quoting United States v. Garrett, 720 F.2d 705, 710 (D.C.Cir.1983)); see also 19 Moore’s Federal Practice—Civil § 206.03[6].
The majority not only attempts to supply the necessary finding, but to do so it rests on an inaccurate reading of the record. The majority asserts that a “basic reading” of the NALC constitution would have revealed the necessary facts. Maj. Op. at 1239. But the constitution nowhere says that the officers’ hotel rooms had been paid for, a fact that was only revealed as a result of Noble’s internal complaints. Additionally, while the constitution permits officers to receive per diems, it nowhere indicates that officers must receive them; that was up to each convention to decide. The constitution first mentions per diems in providing for a Committee on Mileage and Per Diem, which during the relevant period was appointed by Sombrotto. Cf. NALC Const. *1252 art. 9, § 1(g). This committee must “compute and report to the National Convention the name, residence, and amount due each member eligible for mileage and per diem,” id. art. 11, § 6 (emphasis added), which indicates that per diems may be paid to any delegate. The constitution then allows officers to receive the payments by making an exception to their otherwise-applicable salary caps, permitting them to receive per diems “as the National Association, while in session, may direct.” Id. art. 13, § 2. This allows “direction]” by the convention, but not directions occurring under a complete misapprehension of the facts; nor does it indicate that the officers will, in fact, be included among those receiving per diems at any particular convention.
To see why union members might have been left in the dark, a brief supplement to the majority’s account is necessary. At one time, per diem payments were calculated by the committee on an individual basis, with each allowance read aloud to the convention by name and amount. In the 1964 Convention, as the district court found, “a majority of the Delegates decided to dispense with the reading of the individual payments.” Slip op. at 6. The convention did not vote to “substitute[ ]” a summary report, cf. Maj. Op. at 1239, nor did the district court so find, see slip op. at 6, 19. So far as appears, rather than approving a change in the system of individualized accounting, it simply voted — as shown in the following exchange — to dispense on that occasion with the recital of a tedious list of names:
In accordance with the National Constitution, ... we of the Mileage and Per Diem Committee, having checked the vouchers, recommend the payment of 47 delegates for a total sum of $33,044.88. Do you want me to read the individual payments? (Chorus of noes.)
J.A. 657.
The record does not reveal any informed decision of the convention to alter the method of paying per diems, nor were the delegates again asked to dispense with the reading of names. Rather, in subsequent years, the committee engaged in what Noble alleged to be a “verbal shell game.” Pl.’s Am. Proposed Findings of Fact 18. First, via the Board of Trustees, it announced estimates of the various components of the per diem — lost time, hotel costs, and meals and incidentals — and recommended the total as the figure to be provided to “those delegates who will be reported as eligible for the same ... later in the week.” J.A. 660 (1986 Convention); see also Noble, slip op. at 6, 18; J.A. 661 (1992 Convention); id. at 336 (2002 Convention). In the meantime, President Sombrotto asked these nameless delegates to submit vouchers for the committee’s review. See J.A. 661 (1992 Convention); id. at 336 (2002 Convention). A subsequent announcement then disclosed to the convention the total number of delegates found eligible for per diems and the total amount to be paid, slip op. at 19, with the committee reporting that it had “examined each voucher carefully and found it to be correct.” J.A. 337 (2002 Convention); see also id. at 658 (1966 Convention). The convention then voted up-or-down on whether or not to pay the per diems. Slip op. at 19. But at no time did the committee disclose either the identities of those found “eligible,” or whether any officers were among them, or the contents of the vouchers, or the extent to which the union was already bearing the same costs.
The majority argues that the committee’s failure to read individual names and amounts was consistent with a “reasonable” reading of the constitution. See *1253 Maj. Op. at 1239. This is incorrect, for the constitution unambiguously requires that the committee “shall compute and report to the National Convention the name, residence, and amount due each member eligible for mileage and per diem,” NALC Const, art. 12, § 6 (emphasis added), and NALC officers are also “members,” see id. art. 6, § 4. But it is also irrelevant, for the reporting requirement is an independent duty of the committee, not a condition precedent to the officers’ receipt of per diems. The legitimacy of that receipt turns not on an interpretation of the constitution but on whether the delegates, in deciding to approve the payments, had enough information as to who was receiving the payments and, for the officers, the systematic absence of any offsetting burden.
As to the first question, the process itself plainly did not disclose the inclusion of officers. No names were given; not only were officers merely potential recipients of per diems among others, but there were more per diems paid (in every year for which there is evidence in the record) than there were NALC officers to receive them. See J.A. 657 (1964 Convention) (47 delegates); id. at 658 (1966 Convention) (54 delegates); id. at 337 (2002 Convention) (38 delegates). And as to the second question, as noted above, the officers never disclosed the hotel subsidies until after Noble complained. The convention was told that the recipients’ vouchers had been examined “carefully,” but this would have led an ordinary delegate to imagine far more strenuous eligibility requirements than were actually applied. It thus seems doubtful that anyone at the convention (beyond the Sombrotto-appointed committee and the lucky recipients themselves) had been informed of the relevant facts.
The likelihood that delegates were misled is heightened if Noble is correct to assert — as he did in a statement that was apparently uncontradicted and was never addressed by the district court — that NALC’s own employees, of whom he was one prior to his internal complaint and subsequent discharge, were paid a daily convention allowance based only on the “meals and incidentals” portion of the committee’s per diem estimate, on the grounds that their salaries continued and their hotel rooms were paid for by the union. See Pl.’s Am. Proposed Findings of Fact 18-19; Noble Br. 13; Noble Aff. 4/2/04 ¶ 31, at 13; see also Trial Tr. 4/13/04 at 181:6-18 (testimony of William H. Young). Members may have naively thought that what was right for a lowly staffer would also be right for an officer.
The officers contend that they used the excess per diem payments for legitimate expenses such as entertaining union associates, which would otherwise have been properly reimbursable through the usual route. Cf. Kavanaugh Op. at 1244. If true, this might be relevant to the size of NALC’s potential recovery, but it has nothing to do with whether the necessary disclosures were made. The officers also argue that no convention delegate ever requested the names of those receiving per diems prior to Noble’s suit. But DeFries doesn’t require the general membership to guess about undisclosed material information and then ask for it; rather, the benefited officers are obliged to disclose material facts to those whose consent they seek.
Because the district court’s opinion does not reveal whether adequate disclosure of these facts was made during the period relevant to this suit, we should remand for additional findings. If the district court had found on this record that disclosure was inadequate, we certainly could not reverse it for clear error, and Noble is entitled to have this question determined by the original fact-finder in the first instance. Cf. Summers v. Dep’t of Justice, *1254 140 F.3d 1077, 1083 (D.C.Cir.1998); U.S. Postal Serv. v. Nat’l Ass’n of Letter earners, 9 F.3d 138, 146 (D.C.Cir.1993).
* * *
Thanks to the court’s decision, pilfering union chieftains should sleep more easily tonight. At least in this Circuit, their interpretation of union rules to permit their self-enrichment will be deemed reasonable whenever the interpretation passes a laugh test, free from any need to be consistent with the union’s efforts to constrain its officers’ self-help.

 I concur in the per curiam opinion’s reversal of the District Court’s mootness finding as to Noble’s § 201 claim. But the merits of Noble’s § 201 claim appear frivolous. In any event, the District Court can dispose of the § 201 claim on remand.

. We have not yet determined what burdens of production and persuasion apply to such questions, but the district court on remand may find it useful to consider the views of other circuits. E.g., Morrissey v. Curran ("Morrissey II"), 650 F.2d 1267, 1284 (2d Cir.1981) (“A plaintiff in a § 501 suit need not prove the impropriety of every expenditure within a challenged category, but he must provide sufficient evidence of abuses within the category to justify a detailed accounting. At that point the burden will be upon the defendants to prove the propriety of each expenditure.”).

. The defendants claim that Ray supports a laxer standard. It did so, but only for very different sorts of payments. Its point was that "heightened scrutiny” was not suitable merely because a payment provided incidental benefits to an officer; thus, though an officer reimbursed for a business dinner "has been relieved of the personal cost, which he otherwise would have incurred, of daily sustenance,” 753 F.2d at 390, no special scrutiny was in order. But nothing in Ray suggests a willingness to countenance undisclosed "double dip[ping],” as Butler put it. 954 F.2d at 117.