# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 26, 2007 　　　　Decided May 16, 2008

No. 06-7170

DAVID W. NOBLE, JR.,
APPELLANT

v.

VINCENT R. SOMBROTTO, PRESIDENT, NATIONAL
ASSOCIATION OF LETTER CARRIERS, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 94cv00302)

*Bernadette C. Sargeant* argued the cause and filed the briefs for appellant.

*Bruce H. Simon* argued the cause for appellees. With him on the brief were *Brian A. Powers*, *Nicholas R. Femia*, *Peter Herman*, and *Victoria L. Bor*. *Keith R. Bolek* entered an appearance.

Before: SENTELLE, *Chief Judge*, KAVANAUGH, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

2

Separate opinion concurring in part and dissenting in part filed by *Circuit Judge* KAVANAUGH.

Separate opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* WILLIAMS.

PER CURIAM: David W. Noble, Jr., is a member and former employee of the National Association of Letter Carriers ("NALC" or the "union"). In 1994 he brought suit against Vincent R. Sombrotto, then president of the union, as well as eleven other union officers, accusing them of violating their fiduciary duties under § 501(a) of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq*. He later joined the union itself as an additional defendant.

Noble alleged that the officers had directed union funds to their personal benefit in three ways: (1) an unmonitored "in-town" expense allowance; (2) union reimbursement of the employee portion of the officers' Federal Insurance Contributions Act ("FICA") taxes; and (3) unnecessary "per diem" payments made during the union's biennial National Conventions. By way of relief, he sought an accounting from the officers and the recovery by the union of all unlawful expenditures. He also sought the release of certain financial documents under § 201(c) of the LMRDA, 29 U.S.C. § 431(c).

After a bench trial, the district court dismissed all of Noble's claims. *Noble v. Sombrotto*, No. 94-302, slip op. (D.D.C. Sept. 20, 2006). The court held that the various payments to the officers had been properly authorized under the union's constitution and internal procedures, and therefore could not have violated § 501(a). *Id*. at 15-19. It also dismissed Noble's § 201(c) claim as moot. *Id*. at 20-21.

We reverse the district court's judgment as to the expense allowance program and vacate its dismissal of Noble's § 501(a) claim on this issue. We affirm the district court's dismissal of Noble's § 501(a) claims on the FICA reimbursements and the per diem payments. Finally, because we cannot identify the factual basis for the district court's mootness finding, we vacate its dismissal of his § 201(c) claim.

## I. Background

In 1959, Congress passed the Landrum-Griffin Act, also known as the Labor-Management Reporting and Disclosure Act ("LMRDA") to protect against misuse of union funds by corrupt union officials. *See, e.g., Tile, Marble, etc. v. Ceramic Tile Finishers Union Local 25*, 972 F.2d 738 (7th Cir. 1992). LMRDA's § 501(a) makes union officers fiduciaries of union funds and commands that they keep and use those funds solely for the benefit of the organization and its members. It also forbids unions from adopting provisions or resolutions purporting to absolve union officials for breaches of these duties. LMRDA's § 501(b) gives union members a private right of action to sue officers in breach of their fiduciary duties in federal or state court to recover damages on behalf of the labor organization. LMRDA's § 201(c) requires unions to make available to their members all information the organizations are required to file with the Secretary of Labor. That section also provides a private cause of action by which members may compel the union to allow them to inspect records necessary for the members to verify the accuracy of a union's report.

The National Association of Letter Carriers ("NALC" or the "union") is a labor union that represents approximately 300,000 active and retired letter carriers of the U.S. Postal Service. NALC is governed by a constitution which may be amended by majority vote of its biennial National Convention. NALC's

constitution provides for the union to be administered by an Executive Council, whose power is secondary only to that of the National Convention, and gives the council authority to "act between Conventions on all matters related to the welfare of the Union not specifically prohibited by the membership." NALC Const. art. 9, § 11(e) (1992) (The relevant sections of the constitution have been renumbered over time; for the sake of convenience we use the 1992 numbering throughout unless noted otherwise.). The Executive Council is made up of 28 union officers, including 10 "Resident Officers" (including the President), 15 "National Business Agents," and 3 "Trustees." The Executive Council has explicit authority to act between Conventions to "authorize and/or ratify the payment of salaries, wages, expenses, allowances, and other disbursements which it deems necessary and appropriate to the purpose and functioning of this Union, other than provided for." *Id.* § 11(e)(3).

Following the 1992 National Convention, appellant David W. Noble, Jr., then a union employee as well as a longtime union member, became aware of various union expenditures authorized by the Executive Council that redounded to its members' personal benefit. Conducting his own investigation, Noble determined that union officials had longstanding practices of taking $500 monthly expense allowances without providing any supporting documentation justifying such payments; that NALC officers were accepting per diem during meetings of the National Convention even if they incurred no personal expenses; and that the council had decided to reimburse their members for their share of Social Security and Medicare taxes withheld from their NALC paychecks. Noble also found records from past conventions revealing that union officials who had been challenged by union members on some of these practices had given misleading responses, leaving union members under the incorrect impression that the accusations were inaccurate.

Noble filed internal charges against the NALC officers on August 16, 1993, by hand-delivering his accusations to union president Vincent Sombrotto. Sombrotto immediately suspended Noble from his job without pay, after which Noble returned from his long-term leave from the U.S. Postal Service to work as a letter carrier. In accordance with the NALC constitution, Sombrotto called for a five-member investigating committee to investigate Noble's charges and report to a special meeting of the NALC convention. The investigating committee, constituted of NALC members who were not members of the Executive Council, rejected Noble's attempts to participate in the investigation by attending investigatory meetings and calling witnesses, and denied his request to receive a copy of its report in advance of the special convention. After conducting its investigation, which confirmed that Noble's complaints were based in fact, the investigating committee presented its findings to the special convention on October 13, 1993.

At the meeting, the investigating committee reported that the $500 monthly "in-town" expense allowance was a longstanding practice dating to the 1950s. Similarly, it reported that officers' receipt of per diem during convention weeks was both longstanding and justified by a ban on reimbursement for other expenses incurred during that period. The committee also found that NALC was reimbursing officers and staff for their share of Social Security taxes because those members were simultaneously required to pay into the Civil Service Retirement System ("CSRS"). Delegates to the special convention roundly rejected each of Noble's charges of wrongdoing by an average margin of 25 to 1.

On February 17, 1994, Noble filed suit against Sombrotto and eleven other NALC officers alleging that they had breached their fiduciary duties to the union in violation of 29 U.S.C. § 501(a) by (1) authorizing a monthly "in-town" expense

allowance without requiring that expenses be documented; (2) authorizing union reimbursement for the officers' employee portion of their FICA taxes; and (3) collecting per diem payments far in excess of their actual expenses during NALC's biennial National Conventions. Noble sought recovery of all unlawful expenditures from the officers named in his complaint on behalf of the union. Further, Noble brought a claim under LMRDA § 201(c), alleging that he had been denied financial documentation necessary to verify NALC's annual financial reports.

During the subsequent regular National Convention in 1994, NALC membership rejected proposed amendments that would have (1) limited per diem payments to full-time officers during convention weeks, (2) limited the Executive Council's power to authorize salaries and benefits for elected officers, and (3) would have governed future instances when all members of the Executive Council were charged simultaneously. During the 1996 convention, proposed amendments to limit the Executive Council's authority to set wages and benefits and limit their receipt of per diem payments during conventions met the same fate. The 1996 National Convention, however, passed a resolution that approved and confirmed the constitutionality of the $500 "in-town" expense allowance for NALC officers, payment of officers' half of FICA taxes, and payment of per diem to officers during National Convention meetings at the same rate as that paid to other delegates. This resolution received 88% of the nearly 4,500 votes cast.

The district court held a bench trial on Noble's claims on April 13 and 14, 2004. On September 30, 2005, the court issued a memorandum opinion and order dismissing Noble's case with prejudice. Noble subsequently filed a motion to alter or amend the district court's judgment, but the district court denied Noble's motion and on September 20, 2006, issued its final

opinion and order entering judgment in favor of the union officials. *Noble*, slip op. at 20–21. Noble appeals the district court's dismissal of his three claims under LMRDA § 501(a) and his § 201(c) claim.

## II. Standard of Review

Our decision in *Monzillo v. Biller*, 735 F.2d 1456 (D.C. Cir. 1984), requires that we defer to "an interpretation of a union constitution rendered by officials of a labor organization . . . unless the court finds the interpretation was unreasonable or made in bad faith." *Id.* at 1458.[1] We give even greater deference to the union officials' interpretation when, as here, a union convention has approved the officers' interpretation of the union constitution because such approval "undermines a finding that the [officers'] interpretation was unreasonable and made in bad faith." *Id.* at 1464. We review de novo the district court's conclusion that the union officials' interpretation of the constitution was reasonable, and we exercise clearly erroneous review over the district court's factual findings.

## III. In-Town Expense Allowance

Noble's first challenge is to the dismissal of his claim that appellees violated LMRDA § 501(a) by authorizing an "expense allowance" for NALC's Resident Officers. The Executive Council passed resolutions authorizing these payments in 1975, 1977, and 1980, pursuant to its authority under NALC Const. art. 9, § 11(e)(3), to cover the expenses NALC officers residing

---

[1] An interpretation that conflicts with the "stark and unambiguous language" of the union's constitution is ordinarily unreasonable. *Loretangeli v. Critelli*, 853 F.2d 186, 194-95 (3d Cir. 1988). Conversely, an interpretation that accords with the plain language of the union constitution is ordinarily reasonable.

in Washington, D.C. incurred in the performance of their official duties. The 1980 resolution noted that these officials were expected to incur "transportation, entertainment, and other expenses for the benefit of the [union] in the Washington, D.C. Metropolitan Area," and it allowed them to draw "up to $500.00 each month as an allowance for official in-town expenses." Resident Officers and Staff In-Town Expense Allowance Resolution (Dec. 8, 1980). Sombrotto, as president, was reimbursed for "all official expenditures made by him, both in town and out of town." To claim their allowance for a month's expenses, the officers did not need to submit itemized receipts. Instead, the resolution deemed any request for reimbursement as itself a representation that "the sum requested was expended on behalf of [NALC] in the course of performance of official duties." The resolution did, however, require officers to personally keep their receipts for a "reasonable period" of up to five years. NALC reported all reimbursements not documented by receipts as part of the officers' taxable income. *Noble*, slip op. at 5.

Noble argues that the officers' participation in the expense allowance program violated their duty under 29 U.S.C. § 501(a) to manage union funds "in accordance with [the union's] constitution and bylaws." Executive Council members receive salaries that are specified in the NALC constitution and thus beyond the council's power to control, NALC Const. art. 9, §§ 1-10, and Article 6 provides that "[i]n addition to their salaries, all elected officers [i.e., Executive Council members] shall be entitled to reimbursement of all itemized expenses legitimately incurred in conduct of the affairs of the Union." *Id*. art. 6, § 1. Additionally, Article 11 makes it the duty of a three-member Fiscal Committee to "examine all bills submitted for payment and, if found to be correct, to approve them and authorize payment to be made," noting that "[a]ll bills shall be itemized." *Id*. art. 11, § 2(b). On this basis, Noble argues that the Executive

Council had no authority to relax the constitution's itemization and documentation requirements. The district court disagreed, finding as reasonable the Executive Council's interpretation of Article 9, § 11(e) and (e)(3) as authorizing the expenditures, and buttressing this conclusion by observing that Noble had presented no evidence "that the in-town expense allowance was utilized by Resident Officers for purely personal reasons, unrelated to union business." *Noble*, slip op. at 17.

While we agree with the district court's finding that the NALC constitution was ambiguous on this point, *id.* at 16, we must reverse the court's dismissal of Noble's claim on this issue because a key factual finding underlying its conclusion that the interpretation was reasonable was clearly erroneous. Though NALC Const. art. 6, § 1 expressly entitles all elected union officers to obtain reimbursement of itemized expenses, that minimum entitlement does not unambiguously prohibit the council from providing additional payment for expenses or allowances. Neither Article 6, § 1 nor Article 11, § 2(b) unambiguously requires a contrary interpretation. Thus, it was not improper for the district court to use *Monzillo*'s more deferential standard of review in evaluating the reasonableness of the NALC Executive Council's interpretation of their authority to authorize the expenses.

Nonetheless, in finding the Executive Council's repeated authorization of the "in-town" expense allowance reasonable, the district court relied on a clearly erroneous factual finding: that Noble produced "[n]o evidence" that officers had used the allowance for "purely personal reasons, unrelated to union business." *Noble*, slip op. at 17. To the contrary, Noble presented ample circumstantial evidence that officers were using the allowance for personal use. The officers had a direct financial incentive to keep receipts for all union-related expenses because any difference between their documented

expenses and the $500 per month allowance amount was reported as taxable income. Thus, each officer could easily have avoided a substantial additional tax liability by keeping and submitting receipts for legitimate union-related expenses he or she incurred each month. Additionally, the 1980 Executive Council resolution authorizing the challenged allowance specifically charged each officer with retaining receipts for all expenses incurred and to keep them for a "reasonable period" of up to five years. The fact that the vast majority of allowances paid to Executive Council members during the pertinent period were not supported by receipts is thus considerable circumstantial evidence suggesting that much of this money went to officers' personal use.

The district court may have been under the misapprehension that proof of personal use may only be made by direct evidence. Under circumstances closely analogous to those before us, the Second Circuit did imply a requirement of direct proof for such an allegation in *Morrissey v. Curran*, 650 F.2d 1267, 1283–84 (2d Cir. 1981). There, the Second Circuit rejected for insufficient evidence a district court's finding "that all of the weekly allowances paid to the officers were used for their personal expenses" supported by the fact that the officers lacked receipts showing the expenses were made for union business. *Id.* Though *Morrissey* is unclear on whether those union officers were under an obligation to retain receipts as the NALC officers were here, if the Second Circuit has indeed adopted a requirement that allegations of personal use are susceptible of proof only by direct evidence, then we must part ways with our sister circuit on this point. A union member complaining of personal use of union funds by its officers will hardly ever be able to put on direct proof of such use unless an officer confesses to such. Here, Noble presented about as much evidence as one could hope a § 501 plaintiff could gather—that the union had disbursed far more funds for purportedly union-

related expenses than officers responsible for the payments could account for. On remand, the district court must reach the issue of how the union's money was actually used, weighing Noble's circumstantial evidence of misuse against any evidence the officers present to the contrary.

We note as well that the district court's memorandum opinion made no mention of Noble's evidence of bad faith regarding the "in-town" expense allowance. The evidence Noble presented showing that NALC presidents twice misleadingly denied the allowance's existence when challenged on the issue at National Conventions is troubling. While the district court need not specifically reference *all* contrary evidence in its factual findings, *see Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82 (D.C. Cir. 1944), some mention of this evidence would have been welcome here. On remand, we would refer the district court to our decision in *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), which suggests that courts should closely scrutinize self-serving courses of conduct when union officers conceal vital information from union members. *See id.* at 1307 (holding that when union executive committee concealed information on challenged severance payments from its members, it was not "reasonable to say that the severance payments were 'authorized'" despite union bylaws expressly empowering the executive committee to set its own compensation).

Finally, two of the appellees purport to be outside the scope of § 501 for the purposes of this claim. William M. Dunn, Jr., and Robert W. Vincenzi received their expense allowances and FICA reimbursements not from NALC itself, but from other corporate entities affiliated with NALC (the Mutual Benefit Association and the Health Benefit Plan, respectively). The officers argue that Dunn and Vincenzi cannot be held liable under § 501(a), which concerns only the use of union funds, and

that as to them we should affirm the judgment on this alternative ground regardless of our resolution as to the other defendants. The district court found that the Mutual Benefit Association and the NALC Health Benefit Plan were "separate and distinct" from NALC. Slip. op. at 13-14. Noble does not appeal this finding, which makes it conclusive on remand. *See, e.g., Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999). But because the district court neither explained the scope of its factual finding nor drew from it any legal conclusions, and because the degree of separation necessary to avoid § 501's application is itself uncertain, *compare Yager v. Carey*, 910 F. Supp. 704, 728 (D.D.C. 1995), *with Morrissey*, 650 F.2d at 1284, *and Hood v. Journeymen Barbers Int'l Union*, 454 F.2d 1347, 1351-54 (7th Cir. 1972), no final determination of this special defense is appropriate at this time. The district court should resolve this issue on remand.

## IV.  Reimbursement of FICA Payroll Taxes

Noble's second challenge is to the union's reimbursement of the officers' FICA payroll taxes. In December 1980, the Executive Council decided to reimburse all full-time officers and staff for each employee's share of FICA taxes, which is comprised of an employee's mandatory Social Security and Medicare contributions. The Council made this expenditure under the authority of NALC Const. art. 9, § 11(e)(4) (1980), which authorized the council to "establish such benefits as may be required to attract and retain competent personnel, including but not limited to annuity, welfare, vacations, holidays, severance pay, tuition or scholarship, and insurance benefits." The council took this action because all union staff and officers, even while working away from their letter carrier positions with the U.S. Postal Service, were required to pay a fixed percentage of their income into CSRS. CSRS-covered employees did not then contribute into, nor were covered by, Social Security. By

law, Social Security retirement benefits are only payable to those who have paid a minimum amount into the system for at least ten years. *See* 42 U.S.C. § 414. Thus, when letter carriers took full-time positions with the NALC, they found themselves compelled to pay into two different retirement systems—one of which, unless they remained in NALC's employ for ten years or had held another job that paid into Social Security, might never provide them any benefits.

The district court found that Article 9, § 11(e)(4) provided the Executive Council with authority to make this reimbursement an employment benefit, reasoning that the move satisfied that constitutional provision's intent of attracting and retaining competent personnel by "lessen[ing] the financial burden on individuals who chose to hold appointed or elected position within NALC." *Noble*, slip op. at 17–18. Here, as below, Noble challenges this reimbursement as a violation of NALC's constitution, which fixes the salaries that each Executive Council member receives.

We cannot say that the Executive Council's "interpretation conflicted with the stark and unambiguous language of the constitution." *Loretangeli*, 853 F.2d at 194–95. Because the Executive Council's interpretation of the constitution permitting the FICA tax reimbursement as a benefit under Article 9, § 11(e)(4) was neither unreasonable nor made in bad faith, the district court properly deferred to that interpretation. Where, as here, the union constitution explicitly incorporates policy concerns into the Board's grant of authority by directing the Board to establish benefits as "required to attract and retain competent personnel," a given benefit's wisdom as a policy matter is germane to the Board's constitutional authority to authorize it. We see no reason to disturb the district court's dismissal of this claim.

V.  Per Diem Expenses During National Conventions

Noble's remaining § 501(a) claim concerns the payment of "per diem" allowances to Executive Council members during meetings of the biennial National Convention.  NALC provides daily expense allowances to a small group of attendees at the Conventions to cover lost wages, hotel rooms, meals, and incidentals.  (In 2002, for example, the allowance was $420 per day, based on $166.93 for lost time, $158.48 for hotels, and $94.59 for meals and incidentals.)  The officers Noble named in this suit attended every Convention *ex officio* and received per diem payments despite the fact that they lost no wages by attending and frequently stayed in free or reduced-rate rooms at the hotels hosting the Conventions.  Noble alleges that the officers' acceptance of these per diems violated § 501 because they took union funds as  "reimbursements" for expenses they did not actually incur.  Noble further alleges that Convention delegates were misled as to the nature of the payments and that the officers gained Convention approval of their per diem payments without adequate disclosure.

The NALC Const. art. 13, § 2 provides that "[p]er diem shall be paid to each officer as the National Association, while in session, may direct" and Article 11, § 6 directs that "[t]he Committee on Mileage and Per Diem shall compute and report to the National Convention the name, residence, and amount due each member eligible for mileage and per diem."  The district court found that in 1964 a majority of Convention delegates voted to dispense with the reading of the individual payees and substituted a procedure by which the Mileage and Per Diem Committee provided the Convention a summary report of the total per diem allowance per eligible delegate for each day.  *Noble*, slip op. at 19.  The district court found that this practice had continued ever since.  *Id.*

While we take no view on the propriety of per diem payments made to delegates other than Executive Council members which were approved by this summarized procedure, we do not find the Executive Council members' acceptance of payments in this way to be clearly contrary to NALC's constitution. Reading Article 11, § 6 as clearly and unambiguously prohibiting payments of per diem to Executive Council members during the Convention without their names and payment amounts having been read aloud to Convention delegates would flatly conflict with Article 13, § 2. The 1980 and 1992 versions of NALC's constitution explicitly state at Article 13, § 2 that "[p]er diem shall be paid to each officer as the National Association, while in session, may direct." The 1992 NALC constitution lists as "officers" all 28 members of the Executive Council—and no one else. Thus, Article 13, § 2 appears to direct per diem payments to the very group Noble accuses of having violated § 501 by accepting them. We certainly cannot say that NALC's constitution unambiguously forbade them from receiving per diem if their names and addresses were not read aloud.

Thus, NALC officials' interpretation of their constitution as authorizing their acceptance of per diem payments via this summarized approval procedure is owed deference unless shown unreasonable or in bad faith. In determining reasonableness, a district court may consider the union's consistent past practices, *see Conley v. Parton*, 116 L.R.R.M. (BNA) 3071, 3075–76 (N.D. Ind. 1984). We agree with the district court that the Executive Council's reliance on past practice and a plain language reading of other provisions in NALC's constitution as authorizing per diem payments to Executive Council members without having read their names aloud to the Convention was reasonable and entitled to deference.

We further find no merit to Noble's argument that Convention delegates were "misled" about the nature of payments or uninformed that the officers would receive full per diem payments. The total per diem was a set figure and Noble concedes that, even under the streamlined procedure followed through 1992, the Convention was informed of the total per diem amount determined by the Mileage and Per Diem Committee. Combining that information with a basic reading of NALC's constitution would alert delegates that Executive Council officers were receiving those sums, even if no names were read aloud to the Convention delegates. Thus, we cannot say that the district court erred by finding both the summarized procedure and the officers' acceptance of per diem payments during Convention meetings neither unreasonable nor in bad faith.

## VI. President Sombrotto's Failure To Report

While it is unclear in his brief, Noble may have attempted to renew an argument he made below that President Sombrotto personally violated § 501(a) by failing to report his official actions to the biennial Convention in accordance with NALC Const. art. 9, § 1(k). In the district court, Noble specifically complained that Sombrotto should have reported his approval of the Executive Council resolutions authorizing the in-town expense allowance and FICA reimbursements to the Convention. The district court found that:

> [A]lthough Art. 9, § 1(k) requires that the President "shall submit at each Convention a written report of all his/her official acts during his/her term of office," the Executive Council resolutions at issue in this case were official acts of the Executive Council, not the President. Therefore, NALC's interpretation of its Constitution that it does not require such reporting of resolutions is reasonable.

*Noble*, slip op. at 21–22. We agree with the district court's reasoning and affirm its dismissal of this claim.

VII. Noble's "Manifest Unreasonableness" Argument

Noble argues that even if the in-town expense allowances, FICA reimbursements, and per diem payments were fully authorized, the officers violated their fiduciary duties under § 501(a) by personally enriching themselves with union funds. Noble urges this Court to adopt the Second Circuit's approach, such that "where a union officer personally benefits from union funds, a court in a § 501(b) suit may determine whether the payment, notwithstanding its authorization, is so manifestly unreasonable as to evidence a breach of the fiduciary obligation imposed by § 501(a)." *Morrissey*, 650 F.2d at 1274. The defendants ask us to reject the Second Circuit's standard, quoting legislative history of the LMRDA to the effect that compliance with the constitution means that the officers did not breach their duties.

We have not yet given precise content to § 501's fiduciary duties, *cf. Mallick v. Int'l Bhd. of Elec. Workers*, 749 F.2d 771, 780-81 (D.C. Cir. 1984), nor have the parties exhausted the possible tests that could be employed—or even those proposed by the Second Circuit, *see Morrissey*, 650 F.2d at 1274-75 (suggesting that courts apply "judicial scrutiny of the reasonableness and fairness of the transaction . . . at least as rigorous as that undertaken when the fiduciary is a corporate director who has an interest in the challenged transaction"). But we need not decide these questions here. Noble relies solely on his proposed "manifestly unreasonable" standard, which as he presents it, imposes liability on union officers when they approve their receipt of *excessive* benefits, *significantly* above a fair range of reasonableness." Noble Br. 30 (emphasis added)

(quoting *Morrissey*, 650 F.2d at 1275); *see also* Noble Reply Br. 16 & n.4 (contesting the reasonableness of the amounts involved). As to the FICA reimbursements and the per diem payments, however, Noble has failed to show that the payments were outside the kinds and amounts of payments that are generally reasonable in the ordinary course of union officers' activities. They represented at most a small percentage increase in the total compensation of the officers, which was not itself excessive. Thus the payments, if authorized, did not violate § 501 on Noble's own theory. (Noble suggests obscurely that § 501 may impose broader limitations on self-dealing without respect to amount, a possibility he does not develop in any detail and on which we express no opinion.)

As to the in-town expense allowances, the district court will resolve on remand whether the officers used any portion of the allowances for their personal benefit rather than on legitimate union expenses. If so, it would be unnecessary for us to decide whether their actions also violated other duties under § 501. If not, then the officers received no personal benefit that we could review for manifest unreasonableness. The outcome of the remand will moot the issue either way.

VIII. Claim for Release of Documents Under § 201(c)

Finally, Noble brings a claim under § 201(c) for the release of documents relevant to verifying the union's annual financial reports. The district court dismissed this claim as moot, stating that "[d]uring the course of this case, plaintiff has been given access to all of the pertinent NALC records. Further, he no longer contends that he is being denied access to any documents necessary to verify an annual financial report. Therefore, this claim is moot and is dismissed." *Noble*, slip op. at 20-21. Noble contends that the factual findings underlying this ruling are clearly erroneous.

A case is moot if the judgment, regardless of which way it goes, "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (quoting *Clarke v. United States*, 915 F.2d 699, 700–01 (D.C. Cir. 1990)). By contrast, a holding that the plaintiff lacks legal entitlement to his requested relief is plainly a resolution of the merits. *See In re Papandreou*, 139 F.3d 247, 255 (D.C. Cir. 1998). Because the district court characterized its holding as resting on mootness alone, we read the opinion as stating that Noble has been given everything he asked for and can be offered no further relief—not that his requests are unfulfilled but meritless.

While the district court had previously identified "genuine issues of material fact regarding which documents were requested by plaintiff as well as what responsive documents were provided," *Noble v. Sombrotto*, 260 F. Supp. 2d 132, 146 (D.D.C. 2003), the record does not reveal any basis for its later finding that Noble's requests had been fulfilled. The court did note in its findings of fact that Noble had made document requests in a letter to Sombrotto, that the union had contested his right to access but "nonetheless[] made available to plaintiff copies of NALC records relevant to his charges," and that Noble "inspected documents on October 7, 1993." *Noble*, slip op. at 9. But the source the court cites for the proposition that the defendants made copies available—Letter from Vincent R. Sombrotto to David W. Noble, Jr. (Aug. 31, 1993), Defs' Ex. 7—makes clear that even the defendants did not claim to have provided everything Noble sought. Thus there is no indication whether NALC made available to Noble the many documents whose relevance was contested between them, which is what a finding of mootness requires. Nor is it clear which documents Noble was able to review on October 7, 1993.

Noble did contend before the district court that he had been denied documents that were relevant to verifying the union's annual reports, Pl.'s Am. Proposed Findings of Fact 30, 42, and he alleged a variety of document requests made to NALC, not all of which had been fulfilled, *id*. at 29 & nn.103-04, 30 & n.105; *see also* Pl.'s Exs. 28, 31.  In a supplemental filing to this Court, Noble identified nine categories of documents listed in a September 14, 1993 request which he claims never to have received from the union, including records from a union bank account in Minneapolis.

The defendants reply that NALC "produced thousands of pages of financial and other documents to plaintiff," Sombrotto Supplemental Resp. 4, but they do not claim that Noble has received the particular documents he has identified, such as the Minneapolis bank records.  Instead, the defendants argue two propositions unrelated to mootness: (1) that Noble failed to establish just cause to obtain the documents, which is a necessary element of a § 201(c) claim; and (2) that Noble forfeited his claim to any further documents by failing to request them properly in the course of discovery on his § 501(a) claims.

Because we cannot identify the factual basis for the district court's mootness determination, we cannot affirm it, even under the deferential standard of clear error.  *Cf*. 19 Moore's Federal Practice-Civil § 206.03[6].  Moreover, because the district court has passed on neither the merits of Noble's claim nor the forfeiture issue, we decline to reach these alternative grounds. Rather, we vacate the dismissal of Noble's § 201(c) claim and leave these questions, as well as the factual determination of what (if any) records Noble has requested but not yet received, to be resolved on remand.

## IX. Conclusion

For the aforementioned reasons, we affirm the judgment as to the FICA reimbursements, per diem payments, and President Sombrotto's non-disclosure but reverse the judgment as to the in-town expense allowances and as to the § 201(c) claim and vacate the dismissal of each. The case is remanded for further proceedings.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring in part and dissenting in part: I would reject all of Noble's § 501 claims, affirm the District Court's § 501 judgment, and end this 14-year litigation odyssey.

Section 501(a) of the Labor-Management Reporting and Disclosure Act provides that union officers "occupy positions of trust" and that it is the officers' duty "to manage, invest, and expend" the union's money and property "in accordance with its constitution and bylaws." 29 U.S.C. § 501(a). A union member such as Noble may sue a union officer for alleged violations of § 501(a) in order "to recover damages or secure an accounting or other appropriate relief" – but only "*for the benefit of the labor organization.*" § 501(b) (emphasis added). Under § 501(b) of the LMRDA, postal union member Noble filed suit against postal union officers; he claimed that the officers misinterpreted and violated the union constitution in granting themselves various payments and benefits.

In my judgment, this case turns on the nature of the judicial role in § 501 disputes. Our precedents and the statutory text and structure establish a basic principle of judicial restraint in these cases. When a union member sues union officers under § 501 and alleges that they violated the union constitution, we have held that the reviewing court owes "considerable deference" to the officers' interpretation of the constitution; we uphold their interpretation unless it is "unreasonable or made in bad faith." *Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C. Cir. 1984). Of particular importance here, we afford even greater deference to union officials when the union convention has approved the officers' interpretation of the union constitution; we have said that union approval "undermines a finding that the [officers'] interpretation was unreasonable and made in bad faith." *Id.* at 1464. This is the same kind of rule that applies to analogous shareholder derivative actions where it is a "settled proposition that

2

shareholder ratification by a majority of the disinterested shareholders acts as a safe harbor in situations where directors' potentially conflicting self-interests are at issue. Thus, in a classic self-dealing transaction the effect of a fully-informed shareholder vote in favor of that particular transaction is to maintain the business judgment rule's presumptions." *Solomon v. Armstrong*, 747 A.2d 1098, 1115 (Del. Ch. 1999) (internal citation omitted); *see also Sample v. Morgan*, 914 A.2d 647, 663 (Del. Ch. 2007).

The critical point in this case, therefore, is the following: On two occasions, the union convention, which under the union constitution is the union's "supreme body," overwhelmingly voted against Noble's claims and approved the officers' challenged payment practices. Art. 1, § 4. At a Special Convention, 95 percent of approximately 2,000 voting union members specifically rejected the merits of Noble's allegations. A few years later, by a vote of nearly 90 percent of approximately 4,500 voting union members, the National Convention adopted a resolution affirmatively approving the officers' payment practices and confirming that they properly exercised their authority. Because the union approved its officers' interpretation of the union constitution, the federal courts have limited authority under our precedents to upset that interpretation, at least absent an unusual or egregious set of facts.

In this case, the officers' interpretation of the constitution was at least reasonable – which no doubt is why the union twice overwhelmingly approved their interpretation. As to each of the three issues Noble raises, his contrary reading of the constitution is debatable at best. Noble certainly cannot find the kind of unambiguous constitutional language that, under our precedents, would justify a decision by Article III

judges to override the union conventions' twice-considered judgment of what is in their best interests.

First, contrary to Noble's idiosyncratic views, the union constitution did not unambiguously prohibit the Executive Council from authorizing reimbursement of un-itemized in-town expenses; in fact, it permitted the Executive Council to "authorize . . . the payment of . . . expenses, allowances, and other disbursements which it deems necessary and appropriate to the purpose and functioning of this Union, other than provided for." Art. 9, § 11(e)(3). Noble seems to equate any un-itemized expense reimbursement or allowance with a prohibited salary increase, but the constitution simply does not say that. Moreover, un-itemized expense reimbursements or allowances are hardly so uncommon as to raise an inference of an under-the-table "salary increase," at least if the reimbursements are reasonable in amount, as they were here. To be sure, un-itemized expense accounts sometimes result in windfalls and uncertain tax complications, but they also can save both the employer and employee from burdensome administrative paperwork, which is why they can make sense when the amounts in question are relatively minimal. That likely explains why an overwhelming percentage of the rank-and-file voting union members had no problem with the officers' in-town expense reimbursements and voted to approve them.

Second, contrary to Noble's argument, the union constitution did not unambiguously bar reimbursement of officers' FICA taxes; in fact, it authorized the Executive Council to "establish such benefits as may be required to attract and retain competent personnel." Art. 9, § 11(e)(4). Noble's strained interpretation would treat many "benefits" as prohibited salary increases, largely erasing the constitution's clear distinction between salary and benefits. Under Noble's

interpretation, for example, an increase in health insurance benefits for the officers would amount to a prohibited salary increase. But the union constitution says no such thing. So too with respect to reimbursement of FICA taxes. The decision to pay the FICA taxes was entirely reasonable, moreover, because it avoided the "double taxation" that some officers otherwise would face with respect to their retirement benefits as a result of their participation in the Civil Service Retirement System.

And third, contrary to Noble's submission, the union constitution did not unambiguously prohibit officers' acceptance of per diems during the National Conventions; in fact, it stated that "[p]er diem shall be paid to each officer as the National Association, while in session, may direct." Art. 13, § 2. The per diems were reasonable in amount, moreover, particularly given that union officers went "off expenses" during convention week, meaning that they otherwise were not reimbursed for out-of-pocket expenses.

To be sure, Noble offers a plausible interpretation of the somewhat convoluted constitutional language on these three issues, and he may have a good policy argument why union officers should have been even more tightly monitored. But the officers' interpretation of the constitutional language is not unreasonable and is nowhere near the kind of egregious interpretation that would warrant a judicial override of the union's overwhelming approval of the officers' interpretation. I do not agree, moreover, with Noble's contention that the union votes somehow constituted unlawful "exculpatory resolutions." *See* 29 U.S.C. § 501(a). As the District Court rightly concluded, the union votes did not excuse prior constitutional violations; rather, they reflected the union's conclusion that no violations had ever occurred.

5

Finally, for the reasons already explained, the payments in question also were not otherwise "manifestly unreasonable," even assuming that formulation qualifies as a separate test for § 501 claims. *Cf. Morrissey v. Curran*, 650 F.2d 1267, 1274 (2d Cir. 1981).

I would affirm the judgment of the District Court on the § 501 issue. I join all but Parts III and IX of the per curiam opinion.[*]

---

[*] I concur in the per curiam opinion's reversal of the District Court's mootness finding as to Noble's § 201 claim. But the merits of Noble's § 201 claim appear frivolous. In any event, the District Court can dispose of the § 201 claim on remand.

WILLIAMS, *Senior Circuit Judge*, concurring in part and dissenting in part: I join Parts I, II, VI, VII, and VIII of the per curiam opinion, as well as those portions of Part III concerning the district court's fact-finding and the separate arguments of defendants Dunn and Vincenzi. I respectfully dissent from the resolution of Noble's other claims under 29 U.S.C. § 501(b).

The majority's central error lies in its readiness to accept interpretations of the union's constitution that gut that document's minutely detailed salary caps. These interpretations allow the officers to help themselves to union money at will by:

— dispensing with the constitution's requirement of itemized receipts for expense reimbursement (the $500 monthly in-town expense allowances), and

— interpreting "benefits" to encompass salary increases whenever they believe the extra money will help the union "retain competent personnel," namely themselves (the FICA reimbursement issue).

Not content with that, the court short-circuits fact-finding on whether the convention delegates, in approving per diem payments, had any notice that the per diems covered officers' costs that the union itself had already met.

In his separate opinion, Judge Kavanaugh would go even further. He would hold that, in all but the most exceptional cases, the courts have essentially no role whenever delegates to a subsequent union convention accept an interpretation of the union's constitution presented by officers to justify their past conduct. As I develop below, this contradicts both the language and the purpose of the Labor Management Reporting and Disclosure Act ("LMRDA").

I would find the officers' interpretations with respect to the in-town expense allowances and FICA reimbursements to be unreasonable in light of the relevant text; the extrinsic evidence only strengthens this conclusion. The dispute over the per diem payments, meanwhile, doesn't involve interpretation of the union constitution at all, but rather factual claims—never addressed by the district court—that the officers failed to adequately disclose the nature of their double compensation before the union convention approved the payments. I will address the three in that order.

## I. The $500 Monthly In-Town Expense Allowances

The in-town expense allowance program, which handed NALC's officers $500 a month on their say-so alone, cannot be justified on any reasonable reading of NALC's constitution. Article 9 of that constitution determines the precise salary that each officer will receive, down to the last dollar. NALC Const. art. 9, §§ 1-10. (E.g., $62,699.00 for the executive vice president in 1992; no promiscuous rounding here!) Only the National Convention may alter this salary, and only by constitutional amendment. The Executive Council may act "on all matters . . . not specifically prohibited by the membership," *id*. art. 9, § 11(e), but this does not mean prohibited matters must be mentioned by name. In fixing the officers' salaries, the constitution never explicitly forbids payment of under-the-table salaries, but that hardly means the officers could vote themselves one; there is no ambiguity or textual "gap" on the point. Rather, NALC's constitution guards against officers' subverting the limit via sinecures, providing that no officer "shall receive more than one salary from the NALC." *Id*. art. 14, § 6.

Along with fixing the salaries of the Executive Council, the constitution provides that "[i]n addition to their salaries,

[the officers] shall be entitled to reimbursement of *all itemized expenses* legitimately incurred in conduct of the affairs of the Union." *Id.* art. 6, § 1 (emphasis added). This clause is phrased as an exception to an otherwise-applicable limit on compensation, and it directly implies that unitemized expenses are not to be reimbursed. Placing union money in the officers' hands, solely on those same officers' bland assurances that it will be used for union business, completely subverts the clause's obvious goal of preserving accountability. According to the union's independent auditor, Sombrotto personally received $34,000 in reimbursements from November 1988 to July 1993, for which he provided only $5132 in receipts. See Joint Appendix ("J.A.") 685. Defeat of the provision for reimbursement of itemized expenses could hardly be more complete.

The per curiam opinion reads the provision for reimbursement of itemized expenses as merely setting a floor, guaranteeing reimbursement for the officers' itemized expenses without restricting what else they may receive. Maj. Op. at 9. But on that reading, the Executive Council could always vote itself whatever reimbursements it thought appropriate, making a guarantee for reimbursement of *itemized* expenses entirely unnecessary. Rather than mere surplusage, the facially permissive language of Article 6 must be read as an implicit restriction, just as the power of Congress "[t]o establish . . . uniform Laws on the subject of Bankruptcies" is read to limit, rather than supplement, any power to adopt non-uniform bankruptcy laws. See U.S. Const. art. I, § 8, cl. 4; *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 468-69 (1982).

Judge Kavanaugh's separate opinion provides no better solution. He does not address the meaning of this provision, nor does he join Part III of the per curiam opinion. Rather, he considers the unitemized allowances within the officers'

4

power to set "salaries, wages, expenses, allowances, and other disbursements . . . other than provided for." NALC Const. art. 9, § 11(e)(3); cf. Kavanaugh Op. at 3. This clause, however, confers discretion only over questions left unresolved by *other* constitutional provisions. The officers obviously could not rely on it to pay themselves the dual salaries prohibited by Article 14, nor to avoid Article 6's limits on reimbursement of expenses.

The per curiam opinion's reading is further weakened by the NALC constitution's method of administering reimbursements. Article 11 charges the Fiscal Committee with "examin[ing] all bills submitted for payment," requiring that "[a]ll bills shall be itemized." NALC Const. art. 11, § 2(b). The word "bills" includes requests for reimbursement, so Article 11 on its face appears to cover the demands for the $500 allowance. But let us assume *arguendo* that there is ambiguity in the term. In that case, the range of reasonable readings is limited by the factual context. As Sombrotto conceded in his testimony at trial, he considered Article 11's requirements to apply to internal expenses incurred away from Washington, D.C. See Trial Tr. 4/13/04 at 129:4-9, :25, 130:1-2. Yet Article 11 makes no distinction as to where the expenses are incurred. The district court did not address the matter, despite Noble's request, see Pl.'s Am. Proposed Findings of Fact & Conclusions of Law 6-7, Doc. No. 241, Ex. A ("Pl.'s Am. Proposed Findings of Fact"), but any contrary finding of fact would have been clearly erroneous in light of Sombrotto's concession. Thus, the officers themselves considered Article 11 to apply to internal expenses. The officers *might* have interpreted "bills" to be unrelated to internal expenses, posing a different issue for review, but they never did so, and *a fortiori* they never did so reasonably. Assuming that some ambiguity remains, then, the extrinsic evidence merely confirms the text's evident sense.

Judge Kavanaugh rests his concurrence (as to all three issues) on the union convention's votes against Noble's claims. Kavanaugh Op. at 1-2. Of course, these were not votes of the full union membership, but rather votes of delegates to the annual convention. Such delegates have no exact counterpart in the corporate-shareholder analogy. They are elected agents of the members, and are more subject to personal influence by union officers, especially when they vote through public "teller" proceedings requiring them to stand and be counted individually rather than through secret ballot. They are, moreover, likely in some degree to share the officers' viewpoints, interests, and perspectives. Thus "agency" problems—the tendency of agents to a degree to scant their principals' interests in favor of their own—render the convention's blessing a less effective absolution than a vote of the whole membership.

Nonetheless, convention resolutions, if adopted in a fair vote after informed disclosure, would indeed "undermine[] a finding that the [officers'] interpretation was unreasonable and made in bad faith." *Monzillo v. Biller*, 735 F.2d 1456, 1464 (D.C. Cir. 1984). But *Monzillo* treats a delegates' resolution (a form of post-enactment legislative history) only as an interpretive thumb on the scale, not a conclusive extra weight. Section 501 precludes our allowing it any greater impact. Individual suits may be brought *only* after "*the labor organization* or its . . . officers refuse or fail to sue," § 501(b) (emphasis added), language that encompasses non-suit at the direction of a majority vote as well as any other process. Requiring an "unusual or egregious set of facts" to overcome a convention resolution, as Judge Kavanaugh would do, Kavanaugh Op. at 2, will commonly turn this procedural precondition to suit into a virtually insurmountable barrier.

Judge Kavanaugh's theory would also contradict the premise behind LMRDA's *mandatory* reporting and fiduciary

requirements: that even majorities of union members may lack the skill or incentives to protect themselves from predatory officials. To this end, § 501(a) declares any "general exculpatory resolution . . . purporting to relieve any . . . person of liability for breach of [fiduciary] duties" to be "void as against public policy"; giving near-conclusive effect to subsequent interpretive resolutions would enable union leaders to evade that ban. Cf. *Morrissey v. Curran* ("*Morrissey I*"), 423 F.2d 393, 399 (2d Cir. 1970) ("[T]he provisions of § 501 would be completely emasculated if, every time a court . . . found that the officers had breached their duties, the officers could find sanctuary by putting through a constitutional amendment or by-law retroactively to legitim[ize] their former derelictions of duty."). And since some bylaws are designed to protect a minority of union members from their fellows, ending the legal inquiry after a majority vote would be perverse, especially in light of closed-shop or union-shop rules that curtail employee exit. In this particular appeal, the resolutions cannot have so powerful an effect as to overcome the comparatively plain language of the union constitution.

Although I would reverse the district court's judgment on the expense allowances in full, I join the per curiam opinion's finding of clear error as to the historical fact of how the union's money was used. Maj. Op. at 9-11. Such misuse represents a violation of § 501's independent duty to "account to [NALC] for any profit received . . . [in] transactions . . . on behalf of the organization," § 501(a), as well as the more general fiduciary duties the statute imposes, see Maj. Op. pt. VII. Noble alleges not only that the expense allowance program was unauthorized, but that in collecting "reimbursements" the officers falsely represented that they had spent the requested amount on union business, a plain violation of these statutory duties. Given that Sombrotto encouraged the officers to apply for $500 monthly even when

it exceeded their actual expenses, see Sombrotto Tr. 9/15/93, Pl.'s Ex. 47, at 4, the district court clearly erred by finding "no evidence" of this practice. *Noble*, slip op. at 17.[1]

Judge Kavanaugh does not address these additional allegations, see Kavanaugh Op. at 3, but the subsequent interpretive votes are surely irrelevant here. The convention delegates voted only on whether the expense allowance *program* was constitutional, not whether the officers had actually used the money as the program required. The latter is a question of fact, not interpretation.

I also join the per curiam opinion with respect to the officers' bad faith. Maj. Op. at 11. The convention records on the matter are striking. At the 1976 Convention, in the course of a debate over an increase in dues, delegate John Bourlon rose to ask whether it was true that the officers were receiving $500 per month for "in-town expenses." J.A. 165. James H. Rademacher, then president of the union—who had personally signed the 1975 Executive Council resolution approving the unitemized reimbursements—answered by alluding to the constitutional provision for officers' *itemized* expenses. The exchange proceeded as follows:

---

[1] We have not yet determined what burdens of production and persuasion apply to such questions, but the district court on remand may find it useful to consider the views of other circuits. E.g., *Morrissey v. Curran* ("*Morrissey II*"), 650 F.2d 1267, 1284 (2d Cir. 1981) ("A plaintiff in a § 501 suit need not prove the impropriety of every expenditure within a challenged category, but he must provide sufficient evidence of abuses within the category to justify a detailed accounting. At that point the burden will be upon the defendants to prove the propriety of each expenditure.").

[Rademacher:] There is no stipulation in that Constitutional amendment, in-town, out-[of-]town or wherever it happens to be. If they itemized expenses they receive reimbursement according to the Constitution. . . . Does that answer you, Microphone 1?

[Bourlon:] No, sir, I'm sorry, it doesn't answer it. I can agree with what the Chair has said[,] that the Constitution contains it and if they do itemize this thing, then I would agree, but the information I have says that they will be allowed $500 and it does not say if they list it on an expense account. It says they will be given $500.

[Rademacher:] Well, your information is incorrect. The Chair stands here in front of 5,000 delegates and says your information is incorrect.

J.A. 165-66.

Ten years later, at the 1986 Convention, Sombrotto presided over the statement of a similar misrepresentation in the context of a proposal to raise his own salary. Delegate Karen Lippe proposed limiting the increase for a variety of reasons, among them the FICA reimbursements (discussed below) and the fact that "all resident national officers receive a sum of $6,000 per annum unaccountable expense money." J.A. 734. In response, Sombrotto recognized a speaker "on privilege," namely Gene McNulty, a National Business Agent and a member of the Executive Council. McNulty stated as follows:

I would like to correct the Sister. . . .

Also, another piece of misinformation by the Sister, there is not for the resident national officers $6,000 unaccountable. They have to account for that. If you don't believe me, check with the IRS.

*Id*. This was also false: while some officers did submit a limited number of receipts, they were never required to "account" for the actual use of the expense allowance, whether to the IRS or anyone else (although in the absence of receipts NALC evidently reported reimbursements as taxable income). Sombrotto did not correct this misrepresentation, though he had personal knowledge of the situation (and had commented from the chair on other measures). After McNulty's "correct[ion]," the debate did not return to the truth of Lippe's charges; the convention voted her amendment down and approved the proposal to raise Sombrotto's salary.

## II. Reimbursement of FICA Payroll Taxes

The officers' vote to have the union reimburse their personal share of FICA taxes similarly contravened the constitution's clear text. Whether or not the reimbursements were sound policy, the constitution specified a precise salary for each officer. The majority argues that FICA reimbursements may be properly categorized as something other than salary, Maj. Op. at 12-13; but although the Executive Council described the new payment as a "fringe benefit," J.A. 598, under its power to establish "such benefits as may be required to attract and retain competent personnel," NALC Const. art. 9, § 11(e)(4), even a purpose of attracting quality personnel can't turn a salary increase into a non-salary benefit. Lacking authority to increase their own salaries other than by constitutional amendment, the officers necessarily lacked the power to evade this limitation by using a different label.

As I've mentioned above, NALC's constitution sets forth a specific dollar amount for each officer as "the sum . . . per annum, payable weekly," for "the faithful performance of [that officer's] duties." *Id*. art. 9, §§ 1-10. This definition clearly covers the FICA reimbursements, which directly

expanded each week's paycheck by a fixed amount, regularly increasing the annual payments made for the officers' services. The constitutional text offers no basis for distinguishing a 7.65% "FICA reimbursement" from an illegitimate 7.65% raise. The reimbursements also fall within generally accepted definitions of salary, see 9 Oxford English Dictionary 48 (corrected ed. 1933) ("[f]ixed payment made periodically to a person as compensation for regular work"); Webster's Third New International Dictionary 2003 (1981) ("fixed compensation paid regularly . . . for services"), and under the tax code are part of the officers' wages for FICA purposes. See 26 U.S.C. § 3121(a), (a)(6)(A).

If the officers provided reasonable definitions of "benefits" and "salary" that included FICA reimbursements within the former and excluded them from the latter, we would defer under *Monzillo*. Cf. *English v. Cunningham*, 282 F.2d 848, 850 (D.C. Cir. 1960) ("Courts will accept the correctness of an interpretation *fairly* placed on union rules by the union's authorized officials." (emphasis added)). But they have never done so. Before the district court, the officers stated only that they "have historically interpreted" their salaries to be "the amount paid annually to each officer for the services that he or she performs for the Union." See Statement of Material Facts as to Which There Is No Dispute of Individual Defendants Sombrotto et al., Doc. No. 128, pt. 2, ¶ 15, at 4 (Nov. 19, 2001); see also Sombrotto Decl. 11/19/01, Pl.'s Ex. 21, ¶ 9, at 3-4. The FICA reimbursements fit comfortably within that definition.

Moreover, if the term "benefits" includes payments indistinguishable from salary, there is no way to differentiate the payments that the officers cannot increase from the ones they can. *Any* regular payment to the officers (an "extra-special compensation supplement"?) could be justified on such grounds. An interpretation that "reads out of the

constitution an important protective provision" is "patently unreasonable," *Loretangeli v. Critelli*, 853 F.2d 186, 195 (3d Cir. 1988); so a reading that decapitates the salary caps should fail. The constitution describes "benefits" as "including but not limited to annuity, welfare, vacations, holidays, severance pay, tuition or scholarship, and insurance benefits." NALC Const. art. 9, § 11(e)(4). *None* takes the form of a fixed, regular, immediate, and unrestricted cash payment for each week worked. If such payments are "benefits," then the constitution's last restraint on the officers' helping themselves to salary increases appears dead.

Nor does the officers' theory of "double taxation" alter the analysis. Their salaries are constitutionally fixed in pre-tax terms—which they implicitly concede by paying their own personal income taxes—and, as they themselves allege, are adjusted at *every* biennial convention. See Mem. Supp. Mot. Summ. J. Filed by Individual Defs. Sombrotto et al., Doc. No. 128, pt. 3, at 7. The decision of each convention whether or not to grant a raise (and, if so, of how much) is made in the shadow of the governing tax law. Since FICA taxes were a longstanding obligation of all of the union's full-time employees, rather than a new imposition in 1980, the officers would have had every opportunity to make their case to the convention beforehand. When NALC's officers voted to lighten their own tax burden at the union's expense—a move they did not disclose to the membership until after Noble complained—they usurped the convention's authority to determine their salaries.

The majority places great weight on the payments' "wisdom as a policy matter," Maj. Op. at 13, but this does nothing to resolve the interpretive issue. Perhaps the extra pay *was* useful "to attract and retain" officers; yet the officers' authority must still be read consistently with the salary caps, for an unauthorized raise would have been equally attractive.

The policy goal named in the clause is if anything a *limitation* on what benefits may be offered; it does not *expand* the category of "benefits" to include payments that are really salary increases. The only constitutional issue is whether the FICA reimbursements were a (permitted) benefit or a (forbidden) salary increase; business arguments for the reimbursements have no bearing on the issue.

Judge Kavanaugh's opinion goes further, and argues that Noble's argument "largely eras[es] the constitution's clear distinction between salary and benefits." Kavanaugh Op. at 3. Quite the reverse. Although the constitution authorizes the Executive Council to offer "benefits" in order "to attract and retain competent personnel," it gives no license to increase salaries for that purpose. The distinction may be formalistic, but it is in practice the only barrier to almost unlimited self-help. By looking to business reasons for upholding the 7.65% FICA increase, the majority erases the distinction and the constraint.

### III. "Per Diem" Expenses During National Conventions

The majority rejects Noble's claims concerning the "per diem" expenses; in so doing, it misconceives both the record and the nature of his challenge. Because the district court failed to rule on the relevant factual issues—and because this court cannot make the necessary findings on its own—the claim should be remanded for further development of the record.

At every biennial convention after 1964, a small group of unnamed delegates received a "per diem" payment calculated on the basis of certain estimated expenses: lost wages, hotel rooms, and meals and incidentals. Noble argued in the district court that the presidentially appointed Committee on Mileage

and Per Diem asked each post-1964 convention to approve these payments without informing the delegates of two facts: (1) that the union's officers were among those receiving per diem payments, even though they continued to earn their salaries and thus had no "lost time" (unlike rank-and-file mail carriers); and (2) that the union had already paid (in full or part) for most officers' hotel rooms, transferring the union's hotel discount to the officers' benefit. Thus, the members were unaware of these costs' peculiarities—peculiarities that might well have been material to their decision.

Under our precedent in *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997), these allegations state a violation of § 501(a). Payments to the officers are invalid if made without informed consent, for "authorization secured 'without disclosure of . . . material information' is a nullity." *Id.* at 1307 (omission in original). *DeFries*'s "nullity" phrase comes from *United States v. Butler*, 954 F.2d 114 (2d Cir.1992), a case with facts strikingly similar to those here. The *Butler* court upheld the embezzlement conviction under § 501(c) of a union official who had secured approval for "fixed expense payments for attending trustee meetings" without revealing that he and other recipients "were already being fully compensated for actual expenses." *Id.* at 119. The Second Circuit held that approval given under these circumstances was worthless. The Fourth and Fifth Circuits have agreed, holding that when union officers benefit directly from an expenditure, they must prove "that the funds . . . were obtained with the valid authorization of the union after adequate disclosure." *Ray v. Young*, 753 F.2d 386, 389 (5th Cir. 1985);[2] accord *Brink v. DaLesio*, 667 F.2d 420, 424 (4th Cir. 1981).

---

[2] The defendants claim that *Ray* supports a laxer standard. It did so, but only for very different sorts of payments. Its point was

That union officers would receive a full per diem payment while having incurred no "lost time" and while enjoying union-provided hotel rooms could obviously have been material to the convention's decision to approve the per diems. This is not merely a question of whether individual recipients could save money by eating cheaper meals or staying at a cousin's apartment, but whether the factors on which the per diems were based were categorically inappropriate for a distinct group of recipients. Thus, while convention delegates probably understood that the per diems did not vary with run-of-the-mill variations in individual expenses, we have no basis to assume—as the district court made no findings on the matter—that there was adequate disclosure of the facts that reasonable delegates would have thought material.

Noble accordingly argued before the district court that the conventions had been misled. Pl.'s Am. Proposed Findings of Fact 19 ("Stating to the convention that . . . the recommended per diem rate is based on consideration of lost time and hotel rates implies . . . that the payment will be made to people who lose time and pay for their hotel rooms."). But the district court failed to address Noble's argument. Because he properly raises this issue on appeal, we could affirm only if Noble's theory were inadequate as a matter of law (which it is not), or if it were unsupported by sufficient evidence in the record (i.e., if a finding in Noble's *favor* would have been

that "heightened scrutiny" was not suitable merely because a payment provided incidental benefits to an officer; thus, though an officer reimbursed for a business dinner "has been relieved of the personal cost, which he otherwise would have incurred, of daily sustenance," 753 F.2d at 390, no special scrutiny was in order. But nothing in *Ray* suggests a willingness to countenance undisclosed "double dip[ping]," as *Butler* put it. 954 F.2d at 117.

reversible for clear error). We cannot simply supply the factual finding ourselves, however, for "where the correctness of the lower court's decision depends upon a determination of fact which only a [fact-finder] could make but which has not been made, the appellate court cannot take the place of the [fact-finder]." *United States v. Hill*, 131 F.3d 1056, 1061 (D.C. Cir. 1997) (alterations in original) (quoting *United States v. Garrett*, 720 F.2d 705, 710 (D.C. Cir. 1983)); see also 19 Moore's Federal Practice—Civil § 206.03[6].

The majority not only attempts to supply the necessary finding, but to do so it rests on an inaccurate reading of the record. The majority asserts that a "basic reading" of the NALC constitution would have revealed the necessary facts. Maj. Op. at 16. But the constitution nowhere says that the officers' hotel rooms had been paid for, a fact that was only revealed as a result of Noble's internal complaints. Additionally, while the constitution permits officers to receive per diems, it nowhere indicates that officers *must* receive them; that was up to each convention to decide. The constitution first mentions per diems in providing for a Committee on Mileage and Per Diem, which during the relevant period was appointed by Sombrotto. Cf. NALC Const. art. 9, § 1(g). This committee must "compute and report to the National Convention the name, residence, and amount due *each member* eligible for mileage and per diem," *id*. art. 11, § 6 (emphasis added), which indicates that per diems may be paid to any delegate. The constitution then allows officers to receive the payments by making an exception to their otherwise-applicable salary caps, permitting them to receive per diems "as the National Association, while in session, may direct." *Id*. art. 13, § 2. This allows "direct[ion]" by the convention, but not directions occurring under a complete misapprehension of the facts; nor does it indicate that the officers will, in fact, be included among those receiving per diems at any particular convention.

To see why union members might have been left in the dark, a brief supplement to the majority's account is necessary.  At one time, per diem payments were calculated by the committee on an individual basis, with each allowance read aloud to the convention by name and amount.  In the 1964 Convention, as the district court found, "a majority of the Delegates decided to dispense with the reading of the individual payments."  Slip op. at 6.  The convention did not vote to "substitute[]" a summary report, cf. Maj. Op. at 14, nor did the district court so find, see slip op. at 6, 19.  So far as appears, rather than approving a change in the *system* of individualized accounting, it simply voted—as shown in the following exchange—to dispense on that occasion with the recital of a tedious list of names:

> In accordance with the National Constitution, . . . we of the Mileage and Per Diem Committee, having checked the vouchers, recommend the payment of 47 delegates for a total sum of $33,044.88.
>
> Do you want me to read the individual payments? (Chorus of noes.)

J.A. 657.

The record does not reveal any informed decision of the convention to alter the method of paying per diems, nor were the delegates again asked to dispense with the reading of names.  Rather, in subsequent years, the committee engaged in what Noble alleged to be a "verbal shell game."  Pl.'s Am. Proposed Findings of Fact 18.  First, via the Board of Trustees, it announced estimates of the various components of the per diem—lost time, hotel costs, and meals and incidentals—and recommended the total as the figure to be provided to "those delegates who will be reported as eligible for the same . . . later in the week."  J.A. 660 (1986

Convention); see also *Noble*, slip op. at 6, 18; J.A. 661 (1992 Convention); *id*. at 336 (2002 Convention). In the meantime, President Sombrotto asked these nameless delegates to submit vouchers for the committee's review. See J.A. 661 (1992 Convention); *id*. at 336 (2002 Convention). A subsequent announcement then disclosed to the convention the total number of delegates found eligible for per diems and the total amount to be paid, slip op. at 19, with the committee reporting that it had "examined each voucher carefully and found it to be correct." J.A. 337 (2002 Convention); see also *id*. at 658 (1966 Convention). The convention then voted up-or-down on whether or not to pay the per diems. Slip op. at 19. But at no time did the committee disclose either the identities of those found "eligible," or whether any officers were among them, or the contents of the vouchers, or the extent to which the union was already bearing the same costs.

The majority argues that the committee's failure to read individual names and amounts was consistent with a "reasonable" reading of the constitution. See Maj. Op. at 15. This is incorrect, for the constitution unambiguously requires that the committee "*shall* compute and report to the National Convention the name, residence, and amount due each member eligible for mileage and per diem," NALC Const. art. 12, § 6 (emphasis added), and NALC officers are also "members," see *id*. art. 6, § 4. But it is also irrelevant, for the reporting requirement is an independent duty of the committee, not a condition precedent to the officers' receipt of per diems. The legitimacy of that receipt turns not on an interpretation of the constitution but on whether the delegates, in deciding to approve the payments, had enough information as to *who* was receiving the payments and, for the officers, the *systematic absence* of any offsetting burden.

As to the first question, the process itself plainly did not disclose the inclusion of officers. No names were given; not

only were officers merely *potential recipients* of per diems among others, but there were more per diems paid (in every year for which there is evidence in the record) than there were NALC officers to receive them. See J.A. 657 (1964 Convention) (47 delegates); *id.* at 658 (1966 Convention) (54 delegates); *id.* at 337 (2002 Convention) (38 delegates). And as to the second question, as noted above, the officers never disclosed the hotel subsidies until after Noble complained. The convention *was* told that the recipients' vouchers had been examined "carefully," but this would have led an ordinary delegate to imagine far more strenuous eligibility requirements than were actually applied. It thus seems doubtful that anyone at the convention (beyond the Sombrotto-appointed committee and the lucky recipients themselves) had been informed of the relevant facts.

The likelihood that delegates were misled is heightened if Noble is correct to assert—as he did in a statement that was apparently uncontradicted and was never addressed by the district court—that NALC's own employees, of whom he was one prior to his internal complaint and subsequent discharge, were paid a daily convention allowance based only on the "meals and incidentals" portion of the committee's per diem estimate, on the grounds that their salaries continued and their hotel rooms were paid for by the union. See Pl.'s Am. Proposed Findings of Fact 18-19; Noble Br. 13; Noble Aff. 4/2/04 ¶ 31, at 13; see also Trial Tr. 4/13/04 at 181:6-18 (testimony of William H. Young). Members may have naively thought that what was right for a lowly staffer would also be right for an officer.

The officers contend that they used the excess per diem payments for legitimate expenses such as entertaining union associates, which would otherwise have been properly reimbursable through the usual route. Cf. Kavanaugh Op. at 4. If true, this might be relevant to the size of NALC's

potential recovery, but it has nothing to do with whether the necessary disclosures were made.  The officers also argue that no convention delegate ever requested the names of those receiving per diems prior to Noble's suit.  But *DeFries* doesn't require the general membership to guess about undisclosed material information and then ask for it; rather, the benefited officers are obliged to disclose material facts to those whose consent they seek.

Because the district court's opinion does not reveal whether adequate disclosure of these facts was made during the period relevant to this suit, we should remand for additional findings.  If the district court had found on this record that disclosure was inadequate, we certainly could not reverse it for clear error, and Noble is entitled to have this question determined by the original fact-finder in the first instance.  Cf.  *Summers v. Dep't of Justice*, 140 F.3d 1077, 1083 (D.C. Cir. 1998); *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 146 (D.C. Cir. 1993).

\* \* \*

Thanks to the court's decision, pilfering union chieftains should sleep more easily tonight.  At least in this Circuit, their interpretation of union rules to permit their self-enrichment will be deemed reasonable whenever the interpretation passes a laugh test, free from any need to be consistent with the union's efforts to constrain its officers' self-help.